WILLIAM L. FERRELL, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 8679-86, 8742-86,    Filed June 16, 1988.
7283-87.

*Michael J. Christianson,* for the petitioners.
*William H. Quealy, Jr.,* and *Jeffrey A. Hatfield,* for the
respondent.

FEATHERSTON, *Judge:* These consolidated actions are test
cases which were selected for trial to attempt to resolve
approximately 200 other cases (many with multiple petition-
ers) docketed in this Court, as well as other similar cases
pending administratively in the Internal Revenue Service
(IRS). In the cases before the Court, respondent determined
the following deficiencies for 1981 and 1982:

---

[1]The following cases are consolidated herewith: Robert Crowder, docket No. 8742-86, and
Robert A. and Barbara J. Woltman, docket No. 7283-87.

WILLIAM L. FERRELL
Docket No. 8679-86

| Year | Deficiency | Addition | | |
| | | Sec. 6653(a)(1), I.R.C. 1954 | Sec. 6653(a)(2), I.R.C.1954 | Sec.6659, I.R.C.1954 |
| 1982 | $21,797 | $1,090 | 50% of interest due on $21,797 | $6,540 |

ROBERT CROWDER
Docket No. 8742-86

| Year | Deficiency | Addition | | |
| | | Sec. 6653(a)(1), I.R.C. 1954 | Sec.6653(a)(2), I.R.C.1954 | Sec. 6659, I.R.C.1954 |
| 1981 | $38,978 | $1,948.90 | 50% of interest due on $38,978 | $11,693.40 |

ROBERT A. AND BARBARA J. WOLTMAN
Docket No. 7283-87

| Year | Deficiency | Addition | | |
| | | Sec. 6653(a)(1), I.R.C. 1954 | Sec. 6653(a)(2), I.R.C. 1954 | Sec. 6659, I.R.C.1954 |
| 1981 | $7,357 | $368 | 50% of interest due on $7,357 | $2,207 |
| 1982 | 8,620 | 431 | 50% of interest due on $8,620 | 2,586 |

The issues for decision arise from respondent's disallowance of losses and deductions attributable to Western Reserve Oil & Gas Co., Ltd. (hereinafter Western Reserve), a limited partnership in which petitioners were members. The issues to be decided are as follows:

(1) Whether petitioners are entitled to deductions for their distributive shares of Western Reserve's losses and other deductions for 1981 and 1982. The answer to that question depends mainly on whether Western Reserve was engaged in a "trade or business" within the meaning of sections 162(a)[2] and 167(a).

(2) Whether the promissory notes with respect to which Western Reserve accrued interest for 1982 under section 163(a) were genuine indebtedness.

(3) Whether petitioners have shown that Western Reserve is entitled to abandonment losses for 1982 with respect to certain oil and gas leases.

---

[2]All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

(4) Whether any part of petitioners' underpayment of tax for 1981 and 1982 was attributable to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a)(1) and (2).

(5) Whether petitioners' underpayment of tax, if any, for 1981 or 1982 or both is attributable to a valuation overstatement within the meaning of section 6659.

(6) Whether petitioners had a substantial understatement of tax for 1982 within the meaning of section 6661(a).

(7) Whether petitioners are liable for additional interest under section 6621(c)[3] for 1981 and 1982.

FINDINGS OF FACT

## 1. *Background Facts*

Petitioners were residents of California when they filed their petitions. They filed Federal income tax returns for 1981 and 1982 on which they claimed deductions and investment tax credits with respect to Western Reserve, a limited partnership organized under the laws of California.

Western Reserve was organized by Trevor Phillips (Phillips) on December 2, 1981, as a vehicle for a tax shelter program. Under a Certificate and Agreement of Limited Partnership of Western Reserve Oil & Gas Co., Ltd. (partnership agreement), filed December 2, 1981, the general partner was Phillips International Marketing Co., Inc. (Pimco), a California corporation formed in 1981. Phillips was Pimco's sole shareholder and chief executive officer. The stated purpose of Western Reserve was to acquire and develop oil and gas properties anywhere in the United States. During 1981, 1982, and at least part of 1983, Phillips was Western Reserve's general manager. Under the partnership agreement as amended on March 10, 1982, he was added as a general partner; the agreement was again amended on January 31, 1983. Prior to this oil and gas venture, Phillips had worked in sales, advertising, and communications; he had no prior oil and gas business experience.

---

[3]The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c), 100 Stat. 2744, redesignated sec. 6621(d) as sec. 6621(c); the act also altered the definition of "tax motivated transaction" to include "any sham or fraudulent transaction" effective for interest accruing after Dec. 31, 1984. We will hereinafter refer to this section as sec. 6621(c).

As a participant in the program, Magna Energy Corp. (Magna) was organized on October 5, 1981, under the laws of Louisiana by Terry Mabile (Mabile) and William V. Brannan (Brannan). Brannan owned 5 percent of the stock and was president of the corporation. Mabile owned 95 percent of the stock and was the corporation's secretary-treasurer.

Mabile was a former revenue agent who marketed interests in Western Reserve and other tax shelters through an organization which used a card bearing the legend "Mabile & Associates, Tax Shelters Assembled by Former Revenue Agents." Handling all of Magna's dealings with Western Reserve, he was the principal promoter of sales of interests in Western Reserve. His associates, salesmen, or tax advisors who sold Western Reserve limited partnership interests included Garry Gorman, Erroll Davidson, Jack Alexander, and Clark Lilly.

Brannan was the only one connected with Magna or Western Reserve who had any oil and gas business background. He had studied geology, and for 25 years prior to his association with Magna had owned a land title and oil and gas leasing business. His work consisted mainly of determining the ownership of drill sites, pipelines, and the like for oil companies.

Magna's only employees were Brannan, his secretary, and, for a short period of time, a landman. Magna paid Brannan a salary of approximately $60,000 per year. For 1981, Magna received approximately $60,000 from Western Reserve to cover Brannan's salary and expenses and for 1982 and 1983 Magna received $100,000 each year, designated as advance minimum royalties, to cover his salary and expenses.

### 2. *Promotional Activity*

Western Reserve distributed lengthy confidential private placement memoranda (sometimes herein offering memoranda or memoranda) for 1981 and 1982 to individuals interested in making investments. The memoranda stated that units of interest in Western Reserve would be offered and sold in a private offering and that the units had not been registered with the Securities and Exchange Commis-

sion or any State regulatory agency. The memoranda explained that, because the investments involved a high degree of risk, the units were being offered to a limited number of sophisticated investors in the 50-percent income tax bracket who had sufficient knowledge or professional advice to evaluate the partnership as an investment. Investors were required to satisfy the corporate general partner that they had a net worth (exclusive of home, furnishings, and automobile) exceeding $250,000 if residents of California, and $500,000 if nonresidents of that State. The offering memoranda included a lengthy tax opinion by an attorney, John H. Sibbison, discussing a long list of tax issues that might be raised by the program.

Numerous seminars and promotional meetings were held to sell shares in Western Reserve and a great deal of promotional material, in addition to the offering memorandum, was distributed to promote sales. Those materials placed heavy emphasis on the tax benefits to be derived from the program and stressed that Mabile and his sales associates were former revenue agents.

The promotional material used by Mabile and his salesmen outlined a program in which investors would make a minimum cash investment of $10,000 and sign short-term and long-term notes, described below, totaling $140,000; Western Reserve would acquire interests in oil and gas leases from Magna, and Western Reserve would give Magna long-term notes, which would be assumed proportionately by the investors, in amounts equal to the investors' notes to Western Reserve; Western Reserve would accrue the amounts of the notes to Magna as advance minimum royalty deductions, and deductions for those royalties plus other credits and expenses would be passed through the Western Reserve partnership to the investors-limited partners. One piece of promotional material described the tax benefits as follows:[4]

This program was assembled by a team of former IRS agents and auditors with a combined experience level in excess of 100 man years.

---

[4]As explained in the section of the findings entitled "Relationship Between the Investors-to-Western Reserve Notes and the Western Reserve-to-Magna Notes," *infra*, the program was modified to eliminate the third year of the program so that the claimed tax benefits were reduced from $12 for each $1 invested to $8 for each $1 invested.

The impact of the new "Economic Recovery Act" was taken into account before final construction.

✕ 4 to 1 write-off 1st year
  4 to 1 write-off 2nd year, with no cash requirement
  4 to 1 write-off 3rd year, with no cash requirement
✕ Tax write-off is based on IRS Regs., Section 1.612-3(b), which specifically allows a deduction for advance minimum royalties.

Another piece of promotional material distributed in December 1981 reprinted the above table and added:

(b) You invest in YEAR #1 ONLY (1981).
(c) Minimum investment = $10,000 with $1,000 additional investments if you desire. (PLEASE NOTE THAT YOU MAY TAILOR MAKE YOUR TAX SHELTER WITH ADDITIONAL INVESTMENT INCREMENTS TO COVER WHATEVER YOUR TAX LIABILITY IS.)

Still another piece of promotional material is headed "What Happens When a Former IRS Agent Changes Sides?" The subheading reads: "The result is a taxpayers' consultant with all the cunning of a double agent, and creative TAX SHELTERS so effective they should be labelled 'TOP SECRET'."

### 3. *Procedure for Making an Investment*

To the offering memoranda was attached a series of documents to be executed in connection with investments in Western Reserve. The terms of those documents, which included the following, were not subject to negotiation by the investors:

A subscription agreement to be executed by each investor.

Two nonrecourse notes and three nonrecourse notes to be executed by each investor.

The partnership agreement to which each investor was required to give his assent.

An advance minimum royalty agreement between Western Reserve and Magna for each year and a collateral agreement purportedly giving Magna an interest in the nature of a mortgage lien on all assets and future income of Western Reserve to secure the payment of the advance minimum royalties.

A purportedly recourse note to be given each year by Western Reserve to Magna evidencing the liability for the advance minimum royalties.

An agreement to be signed by each investor purportedly assuming a proportionate part of the advance minimum royalty notes given to Magna by Western Reserve.

### 4. *The Subscription Agreement*

Upon making an investment, a limited partner was required to sign a subscription agreement in which he agreed to purchase a minimum of 10 units and make a total minimum commitment of $150,000 consisting of cash, nonrecourse notes, and ostensibly recourse notes. By executing the subscription agreement, he agreed, in addition, to be bound by the partnership agreement, and represented that he met the net worth, income tax bracket, and business knowledge and experience requirements stated in the offering memorandum. The agreement also exculpated the general partner from liability for representations with respect to the partnership or its activities. In addition, each investor agreed to sign an assumption agreement, described below, with respect to notes to be given by Western Reserve to Magna.

### 5. *The Notes Signed by Investors*

In keeping with the subscription agreement, each limited partner paid a minimum of $10,000 in cash and signed two nonrecourse notes payable to Western Reserve 12 months and 24 months, respectively, after the close of the year in which he became a limited partner. These notes state that they are "payable solely out of distributions by Western Reserve." The amount of each such note was equal to the investors' cash investment. In addition, each limited partner signed three purportedly recourse notes, bearing nonrecourse, noncumulative simple interest at the rate of 9 percent, payable to Western Reserve within 20, 21, and 22 years for the 1981 program or payable within 19, 20, and 21 years for the 1982 program, respectively. Each of these long-term notes was in an amount equal to four times the investor's cash investment. All of those investor-to-Western

Reserve notes were purportedly used as security for the payment of the Western Reserve-to-Magna notes more fully described below.

The offering memorandum for 1982 contained the following representation with respect to the recourse notes given at the end of 1982:

In keeping with the IRS, Rev. Rul. 81-283, 12/7/81, and the intent of both Congress and the House of the United States [sic] the full recourse 19, 20, 21 and 22 year notes, which are used to secure repayment of the obligation to MAGNA, at a point when the value of the minerals exceeds the balance of the notes, and primarily for good business reasons, the General Partners will exercise this right, and will convert the balance of the notes into nonrecourse liability. The General Partners, will determine (from independent geological reserve and revenue analysis reports) when the personal liabilities of the Limited Partners are no longer essential to protect the notes from loss and, thus, if and only when the balance of the notes can be converted into nonrecourse liability.

The promotional material represented that the notes would be paid from production of oil and gas. One promotional summary stated:

Regarding the recourse and non-recourse notes, please note that the ONLY way you may get a larger deduction than your cash invested is if you combine CASH + RECOURSE NOTES. The Internal Revenue Service will not allow a deduction without them (PER REVENUE RULING 71-252 and INTERNAL REVENUE CODE SECTION 1.612 3(b)). Please also note that at the bottom of page 56 of the brown prospectus it clearly points out that the notes will be liquidated FROM OIL PRODUCTION ONLY. With 19,200,000 barrels of oil & gas with a market value of $650,000,000 it shouldn't be too difficult to see that it can be done.

### 6. *The Partnership Agreement*

A certificate and agreement of limited partnership for Western Reserve, executed as of December 2, 1981, and amended March 10, 1982, and January 31, 1983, contains several provisions customarily found in limited partnership agreements. Thus, each investor was to become a limited partner and was required to agree to the terms of the partnership agreement. A separate capital account was to be maintained for each partner and the liability of each partner was not to exceed his subscribed capital contribution. In addition, the agreement contains several provisions

tailored for the tax shelter program fashioned by Phillips and Mabile.

Under the partnership agreement, all interest earned from the temporary investment of the partnership's initial capitalization prior to the use of such funds for the purchase of properties was to go to the general partners (Phillips and Pimco). Furthermore, for their services, the general partners were also to receive (1) 30 percent of the gross receipts from partnership operations; (2) reimbursement for all expenses; and (3) management fees for preparing and amending the offering in the amount of 5½ percent of the limited partners' initial cash contributions and 5½ percent of any cash received from any payments on the 12-month and 24-month notes.

Article 10.5 of the partnership agreement contained the following provisions relating to the termination of a partner's interest in Western Reserve and to the notes executed by each investor on becoming a partner:

> Each Limited Partner shall have the option subject to the terms and conditions set forth in this Article to require the General Partner to purchase his interest in the Partnership if the Limited Partner files for bankruptcy. The purchase price to be paid by the General Partner for the Partnership interest shall be for the full amount of Subscriptions that the Limited Partner holds and in no case will the General Partner be required to purchase the interests tendered if less than all of the interests tendered by that Limited Partner are tendered for purchase. The purchase price of such interest will be determined, as of the close of the business day on the last day of the calendar year in which the Limited Partner's notice of bankruptcy is received by the General Partner. Notwithstanding anything to the contrary contained herewithin, the first effective date for any such withdrawal shall be December 31, 1983. Not later than ten (10) days after the withdrawing Limited Partner has been informed of the Cash Surrender Value as provided for in Paragraph 10.6 herewithin this Agreement, the General Partner shall notify the court of competent jurisdiction, within ten (10) days after the 1st day of the calendar year in which the Limited Partner's notice of bankruptcy is received by the General Partner for the Limited Partner's interest. Contemporaneously with the closing of any such sale, the Limited Partner, or his receiver, shall execute such certificates or other documents and perform such acts as the General Partner deems necessary to effect the sale and transfer of the liquidating Limited Partner's interest in the Partnership to PIMCO and to preserve the limited liability status of the Partnership under the laws of the jurisdictions in which it is doing business. *Should a Limited Partner decide, after the initial purchase of a minimum of ten "UNITS" evidenced by a cash contribution of $10,000*

*and a $40,000 19 and/or 20-year note to the Partnership, elect to terminate future obligations to the Partnership due in cash in 1982, 1983 and 1984 and in notes in 21 and 22 years after the formation of the Partnership, the Limited Partner shall, upon making this election, put the General Partners on notice no later than November 1 of the year of the election, and the General Partners shall be obligated to accept the termination of future cash and note obligations to the Partnership as of the end of the calendar year in which notice was received by the General Partners. Notice shall be given by certified United States mail only, and shall be presented at the above listed address or at any address that may later be presented to the Limited Partners as the address of notice by the General Partners.* The cash surrender value shall be computed in accordance with Paragraph 10.6 of the Certificate of Limited Partnership, however, in no event shall the cash surrender value exceed five (5) times five-hundred percent (500%) of the Limited Partner's cash contribution plus accrued interest expense. [Emphasis added.]

In an attempt to unify the positions taken by the several investors on the meaning of the foregoing article 10.5 as well as other issues that might be raised by the IRS on audit of the investors' returns, Phillips, acting for Western Reserve, on September 27, 1984, sent a letter to the investors explaining the partnership's position on some such issues. The letter contained the following discussion of the portion (emphasized above) of article 10.5 of the partnership agreement dealing with a partner's rights to elect to terminate his note obligations to the partnership:

WHAT IF?

A taxing authority took the position that under Article 10.5 of the Limited Partnership Agreement * * * that the above [underlined] clause constitutes a guarantee of rescission of those long-term full-recourse notes, that were used to comprise the subscription amount because a Limited Partner may elect to terminate their [sic] future obligation to the Partnership on these notes, they are effectively rendered non-recourse in nature under Internal Revenue Code 465?

POSITION:

The Partnership would take the position substance over form. The fact is that no Limited Partner notified the Partnership on or before November 1st. that they desired to terminate future obligations in the Partnership. Therefore, the original status of the note never changed and was in effect on December 31st, and, the above non-recourse argument is rendered inapplicable with no effect.

Full-recourse obligations (notes in the present case) are not non-recourse in nature simply because there is an election by a Limited Partner. In order for the full-recourse note to be effectively rendered non-recourse,

the election "MUST" be taken. In the present case, no such election was taken and no notice filed by any Limited Partner.

The March 10, 1982, amended partnership agreement provided:

The General Partners, for good business reasons, have the right, in their sole and absolute discretion, to convert the balance of the full recourse nineteen (19); twenty (20); twenty-one (21); and, twenty-two (22) year notes to non-recourse, and the General Partners will exercise this right, when the properties of the Partnership have developed to the point that they have sufficient value to support the debt obligation so that the personal liability of the Limited Partners is no longer essential to protect lenders from loss, at such time, the Limited Partners will cease to be exposed to loss, in compliance with IRS, Rev. Rul. 81-283, 12/7/81.

### 7. Advance Minimum Royalty Agreements

As part of the documentation of the program, instruments dated December 31, 1981, 1982, and 1983, entitled "Advance Annual Minimum Mineral Royalties and Assignment of Oil and Gas Leases to Properties Agreement," were executed on behalf of Magna as sublessor and Western Reserve as sublessee. These agreements and the accompanying promissory notes, basically similar in form, purportedly described the consideration for the transfer to Western Reserve of leases to which Magna was to acquire title.

Purportedly as advance minimum royalties, Western Reserve agreed to pay Magna $4,000 for each $1,000 partnership unit sold by the partnership up to and including December 31 of each year "and on the same basis, to be consistent, through subsequent years" should Western Reserve "desire to acquire future lease rights" from Magna.[5] This "Payment" was evidenced by "full recourse Partnership promissory notes," described below. Magna did not retain an overriding royalty interest in the leases and agreed during the life of the agreement to assign 100 percent of its "lease rights and subsequent mineral rights" to Western Reserve. In addition to the promissory notes, Western Reserve agreed for each year to pay Magna $100,000 "as an advance option payment" to be applied on Western Reserve's obligation, 88-percent principal and 12-percent interest.

---

[5] The implications of this ambiguous clause are described in sec. 12 of our findings *infra.*

The advance minimum royalty agreements contained the following provisions for payment of the so-called royalty:

(g) The Advance Annual Minimum Mineral Royalty notes assigned to Sublessor [Magna] shall be paid out of Partnership cash; Partnership assets; including, but not limited to equivalent rights to PROPERTIES with proven production that SUBLESSEE [Western Reserve] may acquire; or, no more than fifty (50%) percent of the Partnership's GROSS CASH FLOW as permitted and defined within the Western Reserve Oil and Gas Company Limited Partnership Agreement, a copy of which is attached. All payments and prepayments applied shall, prior to the expiration date of the SUBLESSEE'S [Western Reserve's] obligations to SUBLESSOR [Magna], shall be at the sole and absolute discretion of SUBLESSEE [Western Reserve] unless production is obtained. *Then fifty (50%) percent of the Partnership's Gross Cash Flow, after retirement of the twelve (12) and twenty-four (24) month notes, in cash or kind, shall be an obligatory payment to MAGNA.* All payments made by virtue of this Agreement shall be applied eighty-eight (88%) percent to principal and twelve (12%) percent to interest until all principal and interest due SUBLESSOR [Magna] has been fully paid. SUBLESSOR [Magna] must accept payments in cash or kind from SUBLESSEE [Western Reserve] so long as the values of those payments are true and accurate and reflect industry established fair returns and payments. In the event of a default by the SUBLESSEE [Western Reserve] after drilling has occurred and mineral production payments are obtained, all payments and prepayments agreed to by the parties of this Agreement will subordinate to the interests of the drilling operator(s) as an incentive for them to drill the leased properties. [Emphasis added.]

The terms "Gross Cash Flow" and "Net Cash Flow," used in (g), above, are defined in the partnership agreement as follows:

GROSS CASH FLOW means with respect to any fiscal period of the Partnership, all gross receipts of the Partnership other than capital contributions, during such period, less 30% (thirty) percent for the General Partners' fee.

NET CASH FLOW means [gross receipts] after deducting the five and one-half (5-1/2%) percent of the initial 12 and 24 month cash for the management fee; the General and Administrative Expenses; fifteen (15%) percent for sales commissions; and thirty (30%) percent of the gross receipts for payment of the General Partners fee.

The 1982 and 1983 agreements are in similar form.

### 8. *The Western Reserve to Magna Notes*

Purportedly, pursuant to these advance minimum royalties agreements, Western Reserve executed the following

20-year promissory notes payable to Magna:

| Date of note | Amount | Due date |
|---|---|---|
| Dec. 31, 1981 | $20,584,000 | Dec. 31, 2001 |
| Dec. 31, 1982 | 59,344,000 | Dec. 31, 2002 |
| Dec. 31, 1983 | 38,760,000 | [1]Dec. 31, 2001 |

[1]The record contains two copies of a note for $38,760,000, one dated Dec. 31, 1982, due Dec. 31, 2002, and the other dated Dec. 31, 1983, due Dec. 31. 2001.

Except for dates and amounts, the notes were similar in form. The note dated December 31, 1981, contained the following:

FOR VALUE RECEIVED, the undersigned, the Corporate General Partner of a California Limited Partnership, WESTERN RESERVE OIL AND GAS COMPANY, LTD., promises to pay to MAGNA ENERGY CORPORATION, a Louisiana Corporation, U.S.A., the sum of TWENTY MILLION FIVE HUNDRED EIGHTY FOUR THOUSAND DOLLARS ($20,584,000) with simple interest thereon at nine (9%) percent per annum, noncumulative, payable on December 31, 2001.

As Security for this Note, maker gives to MAGNA ENERGY CORPORATION a Security Interest and contractual right to set-off all money and property of the undersigned now or at any time hereafter coming within the Partnership's custody or control. The provision of the Certificate of Limited Partnership of WESTERN RESERVE OIL AND GAS COMPANY, LTD., are hereby incorporated herewithin as reference.

Brannan, as president of Magna, did not require Western Reserve to give Magna the $20,584,000 note in 1981 or the $59,344,000 note in 1982 as a condition to Magna's assigning its interests in the leases to Western Reserve. In his many years of experience with oil and gas leases, Brannan had never heard of anyone promising to pay such amounts for the assignment of leases of the quality of the leases Western Reserve acquired. The amounts of these notes were not negotiated with reference to the value of the leases but were determined, as explained in the offering memorandum, by the amount of the investments made in Western Reserve by its limited partners.

The payment of the Western Reserve-to-Magna notes was purportedly secured by a collateral agreement executed by Magna and Western Reserve contemporaneously with the Advance Annual Minimum Royalty Agreement. The collateral agreement purportedly gave Magna "a security interest in a mortgage" covering virtually all of Western Reserve's

assets including "All those certain operating recourse obligations of the Debtor's [Western Reserve's] Limited Partner's payable to the Debtor whether presently held or hereafter acquired by the Debtor together with interest thereon, all due and payable not later than December 31, 2004, as provided for by the terms of the Limited Partnership Agreement."

## 9. *The Assumption Agreements*

In keeping with the terms of the subscription agreements, each limited partner executed an assumption agreement. By this agreement, he purported to assume his proportionate share of Western Reserve's notes to Magna ostensibly given for the advance minimum royalties. The agreement contained the following:

WHEREAS, MAGNA has agreed to finance the acquisition price of leases to mineral Properties * * * on the condition that the undersigned assume personal liability for their proportionate share of the obligations to DEBTOR [Western Reserve] to MAGNA * * *

NOW, THEREFORE in order to induce MAGNA to finance the acquisition price of leases to mineral Properties, the undersigned agrees as follows:

(1) The undersigned hereby unconditionally assumes and promises to pay to MAGNA all sums of principal, interest and charges or expenses of any kind whatsoever, now or hereafter due with respect to the financing of Working Interests in leases to mineral Properties as evidenced by the DEBTOR'S promissory notes to MAGNA, provided, however, that the liability of the undersigned hereunder shall not in any event exceed their pro rata share, as the interests of the Limited Partners in the DEBTOR, for the obligations of DEBTOR to MAGNA.

\* \* \* \* \* \* \*

(4) The undersigned authorizes MAGNA to: release or substitute any one or more endorsers or guarantors without affecting the liability of the Partnership hereunder.

## 10. *Partnership Interests Sold*

By December 31, 1981, Western Reserve had 387 limited partners who had contributed cash in excess of $5 million and notes in excess of $70 million (computed). The 1981 partnership return shows that capital contributed during the year (which would include cash and notes) amounted to $76,871,494.

Western Reserve's partnership return for 1982 shows that there were 1,116 partners at the end of the year and that capital contributed during the year (which would include cash and notes) amounted to $145,351,460.

Petitioner Ferrell subscribed to 10 Western Reserve partnership units, paying $10,000 in cash and executing the following promissory notes payable to the partnership in the amount of $140,000:

| | |
|---|---|
| 12-Month nonrecourse note.................... | $10,000 |
| 24-Month nonrecourse note.................... | 10,000 |
| 19-Year recourse note ........................ | 40,000 |
| 20-Year recourse note ........................ | 40,000 |
| 21-Year recourse note ........................ | 40,000 |
| Total.................................... | 140,000 |

He also executed an agreement assuming a proportionate part of the 1982 note from Western Reserve to Magna. His pro rata share was $40,000. Repayment of his pro rata share of the Western Reserve to Magna note was purportedly secured by his 19-year recourse note. On his 1982 income tax return, he claimed a Western Reserve partnership loss deduction of $39,945 and reported a total tax of $58,180.

Petitioner Ferrell made no independent investigation before entering the partnership but relied upon his tax return preparer, Henry Vierregger. Neither he nor Vierregger had any expertise in oil and gas exploration. He made his investment in Western Reserve primarily for the tax benefits.

Petitioner Crowder subscribed to 20 Western Reserve partnership units, paying $20,000 in cash and executing the following promissory notes payable to the partnership in the amount of $280,000:

| | |
|---|---|
| 12-Month nonrecourse note.................... | $20,000 |
| 24-Month nonrecourse note.................... | 20,000 |
| 19-Year recourse note ........................ | 80,000 |
| 20-Year recourse note ........................ | 80,000 |
| 21-Year recourse note ........................ | 80,000 |
| Total.................................... | 280,000 |

He also executed an agreement assuming $80,000, his proportionate part of the 1982 note from Western Reserve to Magna. The repayment of his pro rata share of the note

was purportedly secured by Crowder's 19-year recourse note of $80,000. On his income tax return for 1982, he claimed a Western Reserve partnership loss deduction of $79,942 and reported an income tax liability of $5,368.03.

Crowder was told of Western Reserve by his business manager, Clark Lilly. Lilly had learned of Western Reserve through Mabile who emphasized the first-year 4-for-1 writeoff feature of the program. Lilly was compensated by Mabile for the units he sold Crowder.

Petitioners Woltman subscribed to 20 Western Reserve partnership units (10 units in 1981 and 10 units in 1982), paying cash of $20,000 and executing the following promissory notes to the partnership in the amount of $280,000:

*1981 Program*

| | | |
|---|---|---|
| 12-Month nonrecourse note | $10,000 | |
| 24-Month nonrecourse note | 10,000 | |
| 20-Year recourse note | [1]40,000 | |
| 21-Year recourse note | 40,000 | |
| 22-Year recourse note | 40,000 | |
| | | $140,000 |

*1982 Program*

| | | |
|---|---|---|
| 12-Month nonrecourse note | $10,000 | |
| 24-Month nonrecourse note | 10,000 | |
| 19-Year recourse note | [2]40,000 | |
| 20-Year recourse note | 40,000 | |
| 21-Year recourse note | 40,000 | |
| | | 140,000 |
| Total | | 280,000 |

[1]Collateral for their portion of the 1981 Western Reserve-to-Magna note.
[2]Collateral for their portion of the 1982 note.

They also executed an assumption agreement assuming $80,000 ($40,000 each) as their pro rata share of the 1981 and 1982 notes from Western Reserve to Magna. On their income tax returns for 1981 and 1982, they claimed a Western Reserve partnership loss deduction in the amounts of $40,533 and $40,239 and reported income tax liabilities of "None" and $7, respectively.

The Woltmans made their investments in Western Reserve on the suggestion of Garry Gorman. They made no independent investigation of Western Reserve. Garry Gorman, who received commissions for the sale of Western Reserve partnership interests, advised the Woltmans that

they should not rely on his advice and that they should investigate the program for themselves.

## 11. *Lease Acquisitions*

Magna neither owned nor had options on any leases prior to December 15, 1981, and acquired only one such lease on or before December 31, 1981. In fact, at the time the offering memorandum was issued (July 9, 1981), Magna had not been formed.

Brannan, as Magna's president, located what he regarded as potentially productive oil and gas leases and presented them to Phillips for approval. Upon approval by Phillips, Magna took an assignment of a fractional interest in the working interest in the leases from the existing lessees (Magna did not deal with the landowners) and then assigned its interests to Western Reserve. Western Reserve paid all costs incurred in acquiring the leases. In addition, Western Reserve by joint agreements with Magna and the drilling company-assignors committed itself to expend stated sums for drilling expenses. Apart from the drilling commitments, the average cost of the leases was $10,000 to $12,000. In making the assignments of its interests in the leases, Magna did not retain any overriding royalty interests.

The following table lists the leases in which Magna assigned its interest to Western Reserve and the dates on which Magna obtained assignments of the leases:

| Date of Magna's lease | Acquisition |
| --- | --- |
| Lauridson Prospect. | 12/11/81 |
| Halbert Ranch | 07/23/82 |
| H. Thompson Prospect | 06/01/82 |
| Cavazos Prospect | 06/01/82 |
| Garza Prospect | 10/04/82 |
| S. Texas Syndicate Prospect | 02/28/83 |
| LaSalle County | 02/28/83 |
| McFaddin Prospect | 02/28/83 |
| R.K. Six Prospect | 03/01/83 |
| M. Rollins Prospect | 03/01/83 |
| L. Six Prospect | 03/01/83 |
| McWhorter Prospect | 03/01/83 |
| A. Douglas Prospect | 03/01/83 |
| C. Valentine Prospect | 03/01/83 |
| E.C. Douglas Prospect. | 03/01/83 |
| P. Douglas (Adams) Prospect | 03/01/83 |

| Date of Magna's lease | Acquisition |
|---|---|
| James McNamee Prospect....................... | 03/01/83 |
| Burl Layfield Prospect ........................... | 03/01/83 |
| P.F. Kellar Heirs Prospect....................... | 03/01/83 |
| E.D. Salmons (Wilson) Prospect.................. | 03/01/83 |
| Salmons Prospect .............................. | 03/01/83 |

Western Reserve also entered an "Exploration Agreement" dated June 1, 1982, covering the following properties:

> Edgar Miller Prospect
> Wilson-Courville Prospect
> Jennings Prospect
> LeBlanc Prospect
> Dupont Prospect

For these five prospects the drilling commitment figure was $92,200.

All of the interests in leases acquired by Western Reserve were subject to landowner's royalties and overriding royalties retained by the assignors and retained in previous transactions. Where the acquisition transactions were sufficiently documented to permit a determination, the record shows that the percentage interest acquired by Western Reserve varied from 1 percent to approximately 75 percent of the working interest. As a general rule, the property covered by the leases was adjacent to or near property on which there were producing oil or gas wells.

In connection with the lease assignments, Magna and Western Reserve entered into joint agreements with the assignors[6] who were also drilling companies. The joint agreements committed Western Reserve to advance a stated sum of money to cover the cost of drilling one or more wells on each property. Most of the joint agreements, except the agreement covering the Lauridson prospect, contained, among other provisions, agreements along the lines of the following between Magna, designated as purchaser, and Western Reserve, designated as nonoperator:

8.1 The lease acquired by NON-OPERATOR from PURCHASER by virtue of this Agreement shall in no case exceed twelve (12) months; and,

---

[6]The assignor-drilling companies were Geochemical Surveys, Inc., and a related company, Sands American Corp., Brown & McKenzie, Inc., Arena Oil & Gas Co., D & G Gas & Oil Co., and Key Oil Co.

8.2 Should production be obtained by NON-OPERATOR, NON-OPERATOR shall retain solely mineral rights to those minerals so produced, for the economic life of those minerals; and,

8.3 Upon expiration of the twelve (12) months, without renewal, extension or exception, all lease rights and all privileges thereunder shall revert to PURCHASER.

At the time Western Reserve acquired its interests in the leases, no wells had been drilled on any of the properties except one. A gas well had been drilled in the southwest corner of the Lauridson prospect in Colorado.

As noted, the Lauridson prospect was the only one acquired in 1981 and it cost $4,000.

By August 1, 1983, thirty-nine wells[7] had been drilled on properties covered by the leases in which Western Reserve acquired interests in which some oil or gas was found. The record does not show which ones, if any, of the wells possessed commercially exploitable quantities of oil or gas. At least five dry holes had been drilled by that date.

## 12. *Relationship Between the Investors-to-Western Reserve Notes and the Western Reserve-to-Magna Notes*

As stated above, each investor in Western Reserve was required to sign three long-term purportedly recourse notes payable to Western Reserve 20, 21, and 22 years later (or 19, 20, and 21 years later, depending on the year of the investment) in the total amount of 12 times his cash investment, i.e., three $40,000 notes for each $10,000 invested. Also, it was originally contemplated that, for each year's program, Western Reserve would sign three 20-year notes payable to Magna. Each note would be in an amount equal to 4 times the amount of cash invested for the year, i.e., notes in the total amount of 12 times the year's cash investment, and would be assumed proportionately by the investors. The long-term investors-to-Western Reserve notes were purportedly used as collateral for the payment of the Western Reserve-to-Magna notes. These series of investors-to-Western Reserve and Western Reserve-to-Magna notes provided the foundation for the 12-for-1 tax deductions

---

[7]We have taken this figure from a report, dated Aug. 1, 1983, by REMI, Petroleum Consultants, Inc. There is confusion at some points in the record between the maximum number of wells that could be drilled on the leases in which Western Reserve had interest and the number of wells actually drilled.

promised investors in the promotional material described above.

Thus, it was originally contemplated that for the partnership units sold in 1981, Western Reserve would give Magna its note dated December 31, 1981, for $20,584,000 and would incur an obligation in the same amount for each of the 2 succeeding years. Similarly, for the partnership units sold during 1982, Western Reserve would have incurred an obligation of $38,760,000 for 1982 and each of the 2 succeeding years.

Under date of May 31, 1983, however, Phillips sent a letter to all investors modifying the tax shelter program by canceling all 24-month notes and one set of the long-term notes. The letter contained the following:

Crude oil prices have declined and the marketplace for natural gas is still unstable. (In fact very little of our gas is being purchased). These factors, coupled with the fact that we had anticipated a 4% inflation rate tied to both crude oil and natural gas prices (which did not occur) has necessitated a modification of our program in order to deliver our intended economic goals. ALL 24-MONTH NOTES HAVE BEEN CANCELLED (those notes paid solely from distributions) ALONG WITH THE LONG-TERM NOTES WHICH ACCOMPANY THEM. The CANCELLED COPIES ARE ENCLOSED for your files. By applying this technique, the equilibrium of our program will remain in balance. To adjust the rate of expected return for a $10,000.00 initial investment, just reduce all figures exhibited in your initial pro-forma by one-third (because the total investment has been reduced by one-third). The adjusted result indicates the new anticipated rate of return.

How does this affect you — a 1981 INVESTOR. *You will not* receive a 4 to 1 tax write-off for 1983. *You will* receive ITC's; IDC's; ACRS; WINDFALL PROFITS CREDITS; and, DEPLETION PASS-THROUGHS. The significant portions of your tax benefits have been exhausted. We suggest you contact your tax advisor now.

How does this affect you — a 1982 INVESTOR. *You will* receive your expected 4 to 1 tax write off for 1983. *You will not* receive a 4 to 1 tax write off for 1984. *You will* receive all other benefits available to the 1981 investor.

Notwithstanding the purported mortgage interest given to Magna by Western Reserve as security for the payment of these notes, there is no evidence of record to show that Magna agreed to the cancellation of the notes referred to in Phillips' letter of May 31, 1983.

As a result of this action, Western Reserve did not incur the purported minimum royalties obligation to Magna for

the third year of the 1981 and 1982 programs. The $59,344,000 note dated December 31, 1982, includes the second year's obligation of $20,584,000 with respect to the partnership units sold in 1981, plus the first year's obligation of $38,760,000 with respect to the partnership's units sold in 1982. The note for $38,760,000 represents the second year's obligation with respect to the 1982 sales of partnership units.

Consistent with those note obligations, Western Reserve claimed a deduction on its partnership returns for advance royalties of $20,584,000 for 1981, $59,344,000 for 1982, and $38,760,000 for 1983. Also, on the partnership return balance sheet for 1982, there are shown liabilities on mortgages and notes of $20,584,000 at the beginning of the year and $79,664,000 at the end of the year.[8] On the partnership return balance sheet for 1983 are shown liabilities on notes and mortgages of $79,644,000 at the beginning of the year and $118,336,000 at the end of the year.[9]

### 13. *Conversion of Certain Long-Term Notes to Nonrecourse Notes and Release of Related Assumption Agreements*

On July 29, 1983, Brannan (on behalf of Magna), Pimco, and Phillips (on behalf of Western Reserve) signed and distributed the following agreement releasing the 1981 and 1982 limited partners from personal liability under the assumption agreement with respect to Western Reserve's notes to Magna:

By powers granted the General Partners under the Western Reserve Oil and Gas Company's Limited Partnership Agreement dated December 2, 1981, paragraph 15.4, the General Partners with the consent of Magna Energy Corporation, for good business reasons, namely: the mineral properties of the Partnership have developed to the point that they have sufficient value to support the Partnership's debt obligation to Magna Energy Corporation, and, by authority of IRS Rev. Rul. 81-283, 12/7/81 and other competent authorities do hereby convert the twenty (20) year long-term full-recourse note obligations of the 1981 Limited Partners to

---

[8]As stated above, the 1981 partnership return lists a deduction of $20,484,000 for "Minimum Advance Royalties" as such, but also lists a deduction for "Royalty Fees" of $100,000, bringing the total to the $20,584,000 figure. Also, as stated above, the $100,000 was actually transferred to Magna to cover Brannan's salary.

[9]The record does not show what adjustments were made in the amounts of the notes but they may take into account the cash payments to Magna to cover Brannan's salary and expenses.

non-recourse; and, hereby convert the nineteen (19) year long-term full-recourse note obligations of the 1982 Limited Partners to non-recourse.

Further, Magna Energy Corporation agrees that the personal liability of the Limited Partners are [sic] no longer essential to protect Magna from loss from these obligations based upon information supplied to Magna from an independent reserve analysis report completed by the international consulting firm of R.E.M.I. on or about July 1, 1983 and MAGNA hereby releases same Limited Partners from that portion of their Assumption Agreement obligations only to the extent of the obligations caused to be converted by virtue of this notice.

By this document, Brannan released the 1981 investors from their assumption of the 1981 note in the amount of $20,584,000 and released the 1982 investors from their assumption of $38,760,000 of the 1982 note of $59,344,000. He did not rely upon a report dated August 1, 1983, by REMI, Petroleum Consultants, Inc. (hereinafter the REMI report), referred to in the document, to any degree in deciding to release the investors. The REMI report referred to the total reserves underlying the listed properties, not Western Reserve's fractional interest therein. Brannan had no idea at that time whether the note would ever be satisfied out of oil and gas production from Western Reserve's then-existing leases. He signed the releases only because Mabile or Phillips or both told him the releases were needed to satisfy the "requirements" of the partnership. The record does not show expressly what he meant by "requirements" of the partnership.

At the time the releases were executed, Phillips and Mabile were not aware that the release of the assumption agreements would have adverse tax consequences for the limited partners. When Phillips learned of a Revenue Ruling which indicated that the releases would cause adverse tax consequences, Phillips attempted to withdraw the releases.

Then, under date of April 4, 1984, Phillips sent a letter to the investors which included the following:

your General Partner strongly recommends that you do not accept conversion of your 19 or 20 year long term full-recourse note even though Western Reserve has the assets to comply with Revenue Ruling 81-283. Though only a small chance may exist that an adverse position may be taken by the Internal Revenue Service, again, we feel it is not worth the risk of recapture under Revenue Ruling 465(e). The conversion process began last year but was not completed because the assumption agree-

ments were never returned to the Partnership by Magna Energy Corporation. We currently are in the final conversion process and need you to be aware of your rights in addition to the possible tax implications of this transaction.

As always, we suggest you contact your tax advisor for guidance regarding your possible tax consequences. If you are advised to accept the risk of losing your "at risk" status under the Code, just send us a notarized letter stating you understand the possible adverse tax consequences under Revenue Ruling 465(e) and desire to retain your conversion under Revenue Ruling 81-283. No notification is required if you do not wish to take the risk of losing your deduction. You have thirty (30) days to make this election or we will take the position that you agree with your General Partner's recommendation not to accept the conversion.

## 14. *Abandonment Loss Claims*

In amendments to the petitions, petitioners claim abandonment losses with respect to five leases on which dry holes were drilled in 1982. The claim is based on the allegation that the leases acquired in the "1981 program"[10] had an aggregate value and cost basis of $17,267,428 and a portion of that basis is allocable to the leases on which the dry holes were drilled. The five leases, the percentage of each lease of the "1981 program," the asserted value of the lease, and the abandonment loss claimed in 1982 are as follows:

| Lease name | Percent of 1981 program | Asserted value | Claimed loss |
|---|---|---|---|
| E. Miller | −.02 | $−3,453 | $−3,453 |
| Lelanc | 1.03 | 177,855 | 177,855 |
| Dupont #1 | 10.81 | 1,866,609 | 1,866,609 |
| H. Thompson | 21.97 | 3,793,654 | 3,793,654 |
| Cavasos | 29.62 | 5,114,612 | 5,114,612 |

## 15. *Partnership Returns*

Western Reserve prepared and filed its partnership returns for 1981, 1982, and 1983 on the accrual basis using a calendar year. For 1981, the partnership return showed income of $6,494 (none from the production of oil and gas), total deductions of $20,763,397, and an overall loss of $20,756,903.

---

[10]In general terms, we understand the "1981 program" to refer to leases acquired and wells drilled with funds invested in 1981 and the "1982 program" to refer to leases acquired and wells drilled with funds invested in 1982.

The following is a list of the deductions claimed by the partnership:

*Deductions claimed for 1981*

| | |
|---|---:|
| Rent | $6,290 |
| Depreciation | 8,075 |
| Minimum advance royalties | 20,484,000 |
| Initial drilling costs | 100,000 |
| Royalty fees | 100,000 |
| Telephone | 2,155 |
| Promotion | 2,206 |
| Insurance | 2,519 |
| Accounting and legal | 8,791 |
| Travel | 7,989 |
| Office supplies | 5,472 |
| Dues and subscriptions | 184 |
| Outside services | 35,716 |
| Total deductions | 20,763,397 |
| Ordinary loss | 20,756.903 |

Western Reserve's partnership return for 1982 reported income of $5,972,074, $121,321 of which was gross receipts from the production of oil and gas; the cost of goods sold, shown as $56,488, was subtracted from the gross receipts, leaving gross profit of $64,833. Most of the remainder of the income was accrued interest on the limited partners' notes to Western Reserve. The return showed total deductions of $65,680,899 for an overall loss of $59,708,825.

The deductions claimed for 1982 by the partnership on an accrual basis were as follows:

| | | |
|---|---:|---:|
| Guaranteed payments to partners | | $349,561 |
| Rent | | 6,601 |
| Deductible interest | | 1,852,560 |
| Depreciation | | 42,868 |
| Other deductions: | | |
| Research and development | $1,680 | |
| Advance royalties | 59,344,000 | |
| Drilling costs (intangible) | 3,920,222 | |
| Telephone | 5,878 | |
| Promotion | 2,540 | |
| Insurance | 5,006 | |
| Legal expenses | 4,000 | |
| Accounting fees | 11,331 | |
| Travel | 21,506 | |
| Office supplies | 10,490 | |
| Dues and subscriptions | 3,135 | |

| | |
|---|---:|
| Outside services | $95,745 |
| Auto expenses | 572 |
| Printing expense | 3,099 |
| Bank charges | 105 |
| Total | $63,429,309 |
| Total deductions | 65,680,899 |

The return shows the partners' share of deductions included intangible drilling costs of $3,221,482.

Western Reserve's partnership return for 1983 shows gross receipts of $1,338,670 from oil and gas production, cost of goods sold of $1,285,018, and a gross profit from that source of $53,652. The cost of goods sold consisted of the following:

| | |
|---|---:|
| Production expense | $702,475 |
| Severance tax | 30,166 |
| Intangible drilling—dry hole | 299,818 |
| Depreciation | 252,559 |

The return shows total deductions of $47,261,096 consisting of the following:

| | |
|---|---:|
| Salaries and wages | $145,806 |
| Guaranteed payments to partners | 512,070 |
| Rent | 51,840 |
| Interest | 7,177,680 |
| Taxes | 12,633 |
| Depreciation (not in cost of goods sold) | 21,438 |
| Other deductions | 39,339,629 |

The "Other deductions" included an item of $38,760,000 for "advance royalties."

At the time of the trial, Western Reserve was in the hands of a receiver, Richard Shaffer, appointed in February 1986 by Judge Consuelo Marshall of the U.S. District Court for the Central District of California.[11]

In the notices of deficiency, respondent determined that the deductions claimed by petitioners were not allowable for the following reasons:

---

[11]On Apr. 11, 1984, the IRS sent pre-filing notification letters to the Western Reserve partners advising that the IRS had concluded that deductions with respect to the partnership were not allowable. Western Reserve, Phillips, and 1983 Western Reserve Oil & Gas Co., Ltd., then brought a damages suit against several IRS officials. The suit was dismissed by the District Court, and the dismissal was affirmed by the Court of Appeals for the Ninth Circuit. *Western Reserve Oil & Gas Co. v. New,* 765 F.2d 1428 (9th Cir. 1985).

It is determined that the alleged losses claimed by you in your income tax return with respect to an alleged partnership known as Western Reserve Oil & Gas Company, Ltd., are not allowable because you have not established that the transactions in which the partnership was involved or in which you were involved with respect to such partnership were bona fide arm's length transactions at fair market value, that such transactions were entered into for profit, or that such transactions had any economic substance other than the avoidance of taxes.

The notices of deficiency, in addition, set forth a series of alternative grounds for disallowing the losses. Also, the notices determine that petitioners are liable for the additions to tax set forth above.

## OPINION

In our findings, we have set forth a list of the deductions claimed on Western Reserve's partnership returns for 1981 and 1982, the years before the Court, and the amounts of the claimed losses. The losses were passed through the partnership to petitioners and the other limited partners who claimed them as deductions. In addition, the partners apparently claimed as deductions their distributive share of other items. See sec. 1.702-1(a)(8), Income Tax Regs. We must decide whether the deductions are allowable.[12]

Respondent contends that Western Reserve was neither organized nor operated with the objective of making a profit and that the arrangement pursuant to which its activities were carried out lacked economic substance. Respondent argues that Magna was created to act as a "strawman" to provide a façade in which Western Reserve "obligated" itself to pay the "minimum royalties" in the form of promissory notes so that the limited partners, through their "assumption" of the notes, would have a basis for claiming $12 (or $8) in deductions for each $1 of cash they invested. See secs. 722, 752(a). The possibility that the promissory notes would be paid, respondent maintains, was so specula-

[12]The record is not clear as to the amounts the partners claimed as deductions for items passed through directly to them. Schedule K attached to the 1981 partnership return shows an undesignated credit claim of $53,832; this claim appears to have been an investment tax credit. Schedule K attached to the 1982 partnership return shows a guaranteed payments item of $349,561, intangible drilling expenses of $3,221,482, and investment income of $5,907,241. The parties did not cover these separate items by testimony or brief. Our conclusion that Western Reserve was not engaged in a trade or business and that the various promissory notes lacked economic substance requires denial of these deductions as well as the separately briefed deductions.

tive as to be illusory and there was never any intention that Magna would enforce either the limited partners' long-term notes to Western Reserve or the partners' alleged assumption of the Western Reserve-to-Magna notes. Consequently, respondent argues, the disputed deductions are not allowable.

Petitioners concede that the deductions of $20,484,000 for 1981 and $59,344,000 for 1982 taken by Western Reserve for advance royalties are not deductible as such because the note obligations do not meet the advance minimum royalty requirements of section 1.612-3(b)(3), Income Tax Regs.[13] Petitioners contend, however, that Western Reserve and its general partners acquired and developed the mineral leases with a profit objective and that there was a reasonable prospect in 1981 and 1982 that the notes would be paid and a profit would be realized. On this ground, petitioners maintain that Western Reserve was carrying on a trade or business, that petitioners' assumption of a proportionate part of the Western Reserve-to-Magna notes gave them a basis in their partnership interests sufficient to support the deductions they claimed, and that petitioners are entitled to the benefit of the claimed deductions (with the exception of the advance royalties).

Petitioners presented their case without the testimony of Phillips and Mabile who promoted and managed this tax shelter arrangement. The Court was informed that Mabile was in Canada and refused to come to the United States and that the whereabouts of Phillips was unknown. Brannan was the only principal who testified, but his participation in Western Reserve was limited mainly to locating potentially productive mineral leases that could be acquired.

---

[13]Among other requirements, sec. 1.612-3(b)(3), Income Tax Regs., provides that advance royalties paid or accrued may be deducted for the year in which the minerals are "sold." The regulation further provides, however, that if the lease contains a "minimum royalty provision," advance royalties may be deducted in the year in which they are paid or accrued, whether or not minerals are produced. The section defines "minimum royalty provision" as a provision which "requires that a substantially uniform amount of royalties be paid at least annually over the life of the lease or for a period of at least 20 years." Petitioners carefully base their concession of the disallowed minimum royalty deductions on the ground that the controlling instruments in this case do not contain a minimum royalty provision. See *Brown v. Commissioner,* 799 F.2d 27, 31 (2d Cir. 1986), affg. a Memorandum Opinion of this Court; *Ward v. Commissioner,* 784 F.2d 1424, 1427 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; *Maddrix v. Commissioner,* 780 F.2d 946, 950-951 (11th Cir. 1986), affg. 83 T.C. 613 (1984); *Capek v. Commissioner,* 86 T.C. 14, 47 (1986); *Wing v. Commissioner,* 81 T.C. 17, 38-42 (1983); *Heitzman v. Commissioner,* T.C. Memo. 1987-109.

Petitioners attempted to fill the gap by calling as witnesses some of the individuals who marketed the partnership interests; their testimony was about as credible as some of the representations made in the promotion of the sale of Western Reserve partnership interests. Accordingly, we must decide the case, in the light of the objective facts, without the benefit of any first-hand explanation of the machinations in which Western Reserve engaged.

As we view the facts before us, we must hold for respondent. We do not think that the testimony of Phillips and Mabile would have materially aided petitioners' cause.

### 1. Western Reserve Was Not a "Trade or Business" Within the Meaning of Section 162(a)

With the exception of the $1,852,560 interest and the $10,952,730 abandonment loss deductions claimed in this proceeding for 1982, which will be discussed separately, each of the deductions and credits claimed by the partnership for 1981 and 1982 must meet the requirements of section 162(a) or section 167(a). Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a "trade or business."[14] Section 167(a) allows depreciation deductions only if it is shown that the depreciable property was "used in the trade or business." Section 48(a)(1) allows investment tax credits only for property for which depreciation (or amortization) deductions are allowable. Thus, petitioner has the burden of demonstrating that Western Reserve was a "trade or business" within the meaning of sections 162(a) and 167(a). *Rose v. Commissioner*, 88 T.C. 386, 406 (1987); *Beck v. Commissioner*, 85 T.C. 557, 569 (1985).

To demonstrate that Western Reserve's operations were a trade or business under section 162(a) and 167(a), petitioners must show that its activities were undertaken with "the actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). "Profit" in this context means economic profit, independent of tax savings. *Beck v.*

---

[14]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

*Commissioner,* 85 T.C. at 570; *Surloff v. Commissioner,* 81 T.C. 210, 233 (1983). The determination of whether a profit objective existed must be made at the partnership level. *Polakof v. Commissioner,* 820 F.2d 321, 323 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; *Tallal v. Commissioner,* 778 F.2d 275, 276 (5th Cir. 1985), affg. a Memorandum Opinion of this Court; *Brannen v. Commissioner,* 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); see also *Independent Electric Supply, Inc. v. Commissioner,* 781 F.2d 724, 726 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; *DePinto v. United States,* 585 F.2d 405, 408 (9th Cir. 1978).

As we view the evidence before us, the principal objectives of the Western Reserve program were to help the investors avoid taxes and to enrich the promoters. The arrangement lacked economic substance. There was never any realistic opportunity for Western Reserve to make a profit for its investors, and we do not think there was any bona fide hope that it would do so.

(a) *Emphasis of Tax Benefits*

The objective of providing the investors with substantial tax benefits is shown by the promotional materials used to sell investments in Western Reserve. Those materials emphasized the tax benefits that were to be obtained by the limited partners. See *Rose v. Commissioner,* 88 T.C. 386, 415-416 (1987). Our findings contain some examples of this emphasis. The materials called attention to Mabile's former employment with the IRS and promised deductions for "minimum annual royalties" equal to $12 (later reduced to $8) for each $1 of cash invested as well as other deductions and credits.[15]

Because the partnership planned to adopt the accrual accounting method, the promotional materials emphasized that the partnership would not await exploration for, or production of, oil and gas to take advance minimum royalty deductions. Under the Western Reserve plan, the investors would get the promised deductions even if no oil or gas was

---

[15]Phillips' letter of May 31, 1983, quoted in pertinent part in our findings, canceling the 24-month notes along with the long-term notes which accompany them had the effect of reducing the promised tax benefits to 8-to-1. That letter is dated, however, after petitioners had become Western Reserve partners and after the close of the years in controversy.

produced. The investors, who were required to be in the 50-percent income tax bracket, were thus assured by the promotional material they would save $6 (later reduced to $4) in income taxes for every $1 paid to Western Reserve. This was a paradigmatic case of how an investor could win even by losing. *Barnard v. Commissioner*, 731 F.2d 230, 231 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983). "Where, as here, the promised tax benefits are suspiciously excessive and the transaction as a whole is entered into and carried out with a complete indifference to profit, it is clear what the parties intended to accomplish." *Flowers v. Commissioner*, 80 T.C. 914, 941 (1983); *Patin v. Commissioner*, 88 T.C. 1086, 1112 (1987), on appeal (4th, 5th, 6th, and 9th Cirs., Jan. 25, 1988).

(b) *Payments to the Promoters*

The complete indifference to profit for Western Reserve is demonstrated by the provisions the promoters made for themselves. Those provisions left Western Reserve with only a fraction of any potential income from production of oil and gas with which to operate the business and deprived it of any realistic opportunity for survival.

The promoters spent a substantial amount on legal expenses, preparing and printing the promotional materials and other syndication expenses, and Western Reserve bore these expenses from the invested cash. Fifteen percent of the invested cash paid in by the limited partners and 15 percent of any payments on the 12- and 24-month notes were to go to Mabile and his associates as commissions for marketing the limited partnership interests. Also, Western Reserve was to pay Magna $100,000 per annum as advance royalties; this payment was used to cover Brannan's salary and expenses. Another 5½ percent of the cash investments by limited partners and a similar percentage of any payments on the 12- and 24-month notes were to go to Phillips and PIMCO, purportedly as a management fee. Pending actual use of the invested cash, it was to be placed in money market accounts, certificates of deposit, or the like, and the interest earned thereon was also to go to Phillips and Pimco.

In addition, if any oil or gas was produced, 30 percent of the gross receipts, not just net income, was, in addition, to go to Phillips and PIMCO. The 12- and 24-month investors-to-Western Reserve notes were to be paid from 100 percent of Western Reserve's "net cash flow" which was first to be "distributed" to the limited partners as a bookkeeping entry and then applied on their notes to Western Reserve. After the 12- and 24-month notes were paid, 50 percent of the 70 percent of all gross receipts remaining after the 30 percent distribution to Phillips, i.e., 35 percent of all gross receipts was to go to Magna as "obligatory" payments on the Western Reserve-to-Magna notes.[16] Mabile and Brannan would benefit from this 35 percent of the gross receipts because they owned Magna's stock. This arrangement gave Mabile, as owner of 95 percent of Magna's stock, a share of the gross receipts approximating $118 million (i.e., the total amount of the Western Reserve-to-Magna notes). The May 31, 1983, cancellation of the 24-month notes merely hastened the day when the "obligatory" payment of 35 percent of the gross receipts to Magna would begin.

Thus, Phillips and Mabile, neither one of whom had any oil and gas business experience, took more than 20 percent (15 percent to Mabile as sales commissions and 5½ percent to Phillips and PIMCO as fees) of the total investments by Western Reserve's limited partners, leaving less than 80 percent available for use in the business. In addition, they created a mechanism for siphoning 65 percent of the *gross receipts* to themselves, 30 percent to Phillips and 35 percent to Magna, until the Western Reserve-to-Magna notes in the face amount of $118 million were paid. This leaves only 35 percent of the *gross receipts* for the payment of severance taxes, all overhead, production, operating and other expenses, and any subsequent lease acquisitions and drilling expenses. Western Reserve's partnership returns for 1982 and 1983, the only years for which there was any operating

---

[16]Under the partnership agreements, quoted in pertinent part in our findings, Phillips and Pimco, his corporation, as general partners, were to receive 30 percent of any "gross receipts" from oil or gas production. Under paragraph (g) of the advance minimum royalty agreement, quoted in our findings, it was "obligatory" that Magna was to be paid 50 percent of Western Reserve's "gross cash flow," which was defined in the partnership agreement as its gross receipts less the 30 percent payable to the general partners. Thus, all expenses had to be paid out of the remaining 35 percent of the gross receipts and Mabile was to receive indirectly approximately the same percentage of the gross receipts as Phillips.

experience, show that the cost of goods sold alone ($56,488 for 1982 and $1,285,018[17] for 1983) far exceeded 35 percent of the gross receipts ($121,321 for 1982 and $1,338,670 for 1983) from oil and gas production. These cost of goods sold figures do not include the long list of deductions shown in our findings.

We think it inconceivable that any organizers of a new oil and gas business with a bona fide profit objective would begin by taking out for themselves more than 20 percent of the capital and arranging to siphon off for themselves 65 percent of the gross receipts for their own benefit. See *Polakof v. Commissioner*, 820 F.2d at 324. This arrangement, leaving Western Reserve with only 35 percent of its gross receipts with which to pay all future operational and capital costs, deprived the venture of any reasonable prospects of realizing a profit for the investors.

(c) *Western Reserve's Notes to Magna*

Petitioners point to Western Reserve's multi-million-dollar notes to Magna to show that the partners had a cost basis evidenced by bona fide obligations to support the claimed deductions. Petitioners assert that these recourse notes, purportedly assumed by the investors, were given in good faith to Magna as consideration for both the assignment of the oil and gas leases and Magna's expert assistance and counsel in the management and operation of Western Reserve's business. Under this theory, petitioners contend that the notes reflect Western Reserve's cost of the leases and that, if we understand their position, the limited partners' assumption of their respective shares of the notes establish a basis for the partners' claimed losses. See secs. 722, 752(a).[18] We do not agree.

---

[17]The cost of goods sold as reported on the 1983 partnership return includes an item labeled "Intangible drilling—dry hole—$299,818." Even if that item is eliminated, the cost of goods sold far exceeds 35 percent of the gross receipts. In fact, production expenses alone ($702,475) exceeded 50 percent of the gross receipts ($1,338,670).

[18]SEC. 722. BASIS OF CONTRIBUTING PARTNER'S INTEREST.

The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

SEC. 752. TREATMENT OF CERTAIN LIABILITIES.

(a) INCREASE IN PARTNER'S LIABILITIES.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption

We are fully aware of the long line of decisions of this Court and other courts that have dealt with bona fide long-term recourse notes assumed by limited partners. In those cases, the courts have given credence to recourse notes as a basis for supporting claimed losses or establishing section 465 "at risk" amounts. See, e.g., *Pritchett v. Commissioner,* 827 F.2d 644 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985) (at risk under sec. 465); *Follender v. Commissioner,* 89 T.C. 943 (1987) (at risk under sec. 465; partnership's basis); *Melvin v. Commissioner,* 88 T.C. 63, 75 (1987) (at risk under sec. 465); *Abramson v. Commissioner,* 86 T.C. 360 (1986) (partnership's basis; at risk under sec. 465).

In all of those cases, however, the recourse notes were given to independent third parties whose interests did not necessarily coincide with those of the note makers. Those cases did not involve, as does the instant case, transactions between two organizations created to carry out a tax shelter scheme, notes given for amounts having no relationship to economic reality, or notes which almost certainly would not be paid. See *Goldstein v. Commissioner,* 364 F.2d 734, 740-741 (2d Cir. 1966), affg. 44 T.C. 284 (1965); *Durkin v. Commissioner,* 87 T.C. 1329, 1376-1377 (1986); *Waddell v. Commissioner,* 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988); *Houchins v. Commissioner,* 79 T.C. 570, 589-590 (1982).

In the instant case, we are convinced, as stated above, that the purportedly recourse Western Reserve-to-Magna notes served merely as a façade for the support of the tax benefits promised the investors and as a vehicle for the transfer of 35 percent of Western Reserve's gross receipts to Magna. The possibility that the notes would be repaid was illusory. We base our findings on the totality of several factors.

First, Magna was not an independent unrelated third party but was an essential element of the tax shelter team. The notes to Magna were needed to provide part of the predicate for the promised $12 (later $8) in tax deductions for each $1 invested by the limited partners. Without the

---

by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

Western Reserve-to-Magna notes or the related notes of the investors, there would have been no ground for claiming such dramatic tax benefits.

Brannan testified that he suggested to Mabile that the leases be acquired in a "one-to-one oil and gas setup" but Mabile explained to him, in substance, that the leases had to go through a second company in order to meet the "requirements" of the partnership. The clear inference is that by "requirements" Mabile meant requirements for the tax benefits.

Second, the amounts of the notes bore no relationship to the value of the leases Western Reserve acquired. Brannan testified, in substance, that the leases cost an average of $10,000 to $12,000 each. During the 3 years, 1981, 1982, and 1983, Magna acquired interests in 25 leases for an amount, computed under Brannan's estimate, of some $250,000 to $300,000 and then assigned them to Western Reserve. Yet Western Reserve not only paid the drilling company-sublessors for the leases but then at the end of the year gave Magna its multi-million-dollar notes. Magna paid the assignor-sublessors nothing. In fact, on December 31, 1981, when Western Reserve signed the first $20,584,000 note, Western Reserve had acquired only one lease, the Lauridson lease in Colorado, and it cost only $4,000.

The amounts of the notes were not negotiated in relation to the value of the leases. The first offering memorandum issued nearly 6 months before any leases were acquired stated that the amounts of the notes were to be keyed to the amounts of the cash invested by the limited partners, not to the value of the leases. See *Rose v. Commissioner*, 88 T.C. 386, 417-419 (1987). The amounts of the notes thus could not be fixed until Mabile and his sales force turned in their reports on the total amounts invested at the end of each year. See *Independent Electric Supply Co. v. Commissioner*, 781 F.2d 724, 728 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. In fact, when the 1982 $59,344,000 note was executed, which included the second $20,584,000 obligation for the 1981 program, petitioners now allege that more than 62 percent of the 1981 program, as discussed below, had allegedly been abandoned.

Third, the form of the three Western Reserve-to-Magna long-term notes is foreign to the business world. The principal of each of the three notes is due and payable within 20, 20, and 18 years, respectively.[19] The notes provide for the payment of simple interest on the principal amount "at nine (9%) percent per annum, non-cumulative, payable on December 31, 2001," 2002, and 2002, respectively. The term "non-cumulative" is not explained in the record. As we interpret the notes, however, the interest portion is nonrecourse except for the interest in the year in which payment is made.

Fourth, the agreements whereby each limited partner assumed his proportionate share of the Western Reserve-to-Magna notes recites that the agreement was made "to induce MAGNA to finance the acquisition price" of the leases to be acquired. The undisputed facts are that Magna had no capital or other funds with which to finance the acquisition of leases and, as stated above, all the leases were paid for directly by Western Reserve, not Magna. This stated justification for the notes thus has no factual basis.

Finally, the release on July 29, 1983, by Magna and Western Reserve of the investors from their assumptions of proportionate shares of Western Reserve's notes to Magna was prearranged and engineered by Phillips and Mabile. In promotional material distributed by Mabile and his associates in December 1981, quoted in part in our findings, it was explained that "the ONLY way you may get a larger deduction than your cash invested is if you combine CASH & RECOURSE NOTES," pointing out that the offering memorandum clearly states that "the notes will be liquidated FROM PRODUCTION ONLY." The assumption agreements themselves expressly authorize Magna "to release or substitute any one or more endorsers or guarantors without affecting the liability of the Partnership."

In keeping with the foregoing authorization, Western Reserve and Magna on July 29, 1983, released the limited partners from their personal liability on their assumption agreements and converted the 20-year notes for 1981 and

---

[19]Omar Gomez, who invested in Western Reserve through a partnership of which he was a member, explained that he was not concerned about his personal liability on his assumption of his pro rata share of the Western Reserve-to-Magna notes because "it's sometime in the future. I might not live that long."

the 19-year notes for 1982 to nonrecourse notes. The release stated that it was given because the partnership's reserves "had sufficient value to support the partnership's debt obligations." Yet less than 2 months previously, on May 31, 1983, Phillips canceled the 24-month investors-to-Western Reserve notes and the accompanying long-term notes, one-third of the whole program, because, he stated, crude oil prices had declined and the natural gas could not be sold. Brannan testified that he agreed on behalf of Magna to release the partners from liability under their assumption agreements because Mabile or Phillips or both assured him this was the thing to do under the requirements of the partnership. Brannan admitted that the REMI report, cited as justification for the release, contained estimates of all the reserves underlying the leases, not the fractional interests acquired by Western Reserve. On learning that the limited partners' release could cause them to suffer adverse tax consequences, Phillips attempted unilaterally to rescind the releases and reinstate the assumption agreements.[20] He later sent a letter dated April 4, 1984, to the investors informing them of the adverse consequences and suggesting that, for tax reasons, they decline to accept the releases.

This kind of bizarre behavior is not characteristic of the business world. It serves only to emphasize that the notes were a tax shelter façade and that there was never any intention to enforce them or the assumption agreements. The notes and assumption agreements had no practical economic effect other than the creation of tax losses. *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988), affg. *Brown*

---

[20]The record includes without clarifying testimony the following document dated Nov. 9, 1983, signed by Brannan for Magna and by Phillips for PIMCO and as individual general partner:

SUBJECT: CONVERSION OF ASSUMPTION AGREEMENT OBLIGATIONS BACK TO MAGNA ENERGY CORPORATION.

By the powers granted the Corporate General Partner and the Individual Gen⋯al Partner under the Western Reserve Oil & Gas Company's Limited Partnership Agreement dated December 2, 1981, the Western Reserve Oil & Gas Company Limited Partnership, by virtue of this Agreement, do hereby reacquire their personal obligations previously released by MAGNA ENERGY CORPORATION on July 29, 1983; their portion(s) of the Assumption Agreement to the extent of those obligations previously released or converted by MAGNA ENERGY CORPORATION.

It is the opinion of the Corporate General Partner and the Individual General Partner that MAGNA ENERGY CORPORATION needs to be protected from loss from these obligations, and these losses can be prevented by this reassignment of obligations back to MAGNA ENERGY CORPORATION.

*v. Commissioner,* 85 T.C. 968 (1985); *Neely v. United States,* 775 F.2d 1092, 1094 (9th Cir. 1985); *Thompson v. Commissioner,* 631 F.2d 642, 646 (9th Cir. 1980), affg. 66 T.C. 1024 (1976). Western Reserve and Magna, the payor and payee of the notes, moved in lock step to attempt to enrich Phillips and Mabile and to attempt to provide the investors with the tax benefits Phillips and Mabile had promised. The Western Reserve-to-Magna notes do not establish a basis for supporting the disputed deductions.

As to petitioners' contention that Magna was to provide assistance and counsel on Western Reserve's operations, Magna had no resources with which to do that. The oil and gas business requires the exercise of judgments on geophysical, production, engineering, transportation, and a host of other specialized business considerations. Magna had only two regular employees, Brannan and a secretary. The record does not show that Brannan had any experience that qualified him to provide Phillips with needed guidance. He had a degree in geology but he had operated a land title business for 25 years. His work gave him access to drillers who had promising leases, and he helped Western Reserve acquire such leases from several drilling companies. He obviously knew more about the oil and gas business than Phillips, but the record does not show that he was qualified to provide any substantial advice on operations or that it was intended that he do so.

(d) *The Excessiveness of the Western Reserve-to-Magna Notes*

Despite the facts that the amounts of the Western Reserve-to-Magna multi-million-dollar notes were determined pursuant to a formula announced in the offering memorandum, petitioners make a valiant effort to show that Western Reserve somehow came up with leases with underlying reserves of oil and gas sufficient to produce enough income over the productive life of the leases to pay the Western Reserve-to-Magna notes in full and give the limited partners a large profit on their investments. Petitioners' computations indicate profit of $70 million on the 1981 investments and $162 million on their 1982 investments.

After discounting the potential income figures, petitioners contend that the values of the leases when acquired were $17,267,428 for the 1981 program and $57,079,448 for the 1982 program. These values are only a few million dollars less than the face amounts of the 1981 and 1982 Western Reserve-to-Magna notes. Compare *Milbrew, Inc. v. Commissioner*, 710 F.2d 1302, 1307 (7th Cir. 1983), affg. a Memorandum Opinion of this Court. We agree with respondent that petitioners' valuation and projected income figures are unrelated to reality.

Petitioners' valuation of the leases based on estimated reserves and a discounted cash-flow overlooks the fact that fair market value even "for a producing [oil and gas] property is not a unique value that may be derived by solving equations. It is rather a subjective estimate reflecting the expectations of the buyer and seller at the time of any trade."[21] Accordingly, "when two parties dealing at arm's length assign a certain value to property being sold, and when that value has economic significance to each of the parties, the value assigned by the parties is very persuasive evidence of its fair market value." *Narver v. Commissioner*, 75 T.C. 53, 97 (1980), affd. 670 F.2d 855 (9th Cir. 1982); *Elmhurst Cemetery Co. v. Commissioner*, 300 U.S. 37, 39 (1937).

Beginning in December 1981 and continuing through at least part of 1983, Brannan on behalf of Magna negotiated the acquisition of Western Reserve's leases from third-party owners. He negotiated the acquisitions in arm's-length transactions with drilling companies that had no previous business connection with Western Reserve. According to Brannan, the leases cost an average of $10,000 to $12,000;[22] on this basis, the total amount paid for the leases would fall between $250,000 to $300,000, a tiny fraction of the total

---

[21]This language is quoted from an article, which is part of the record, by F.A. Garb, H.J. Gruy & Associates entitled "Assessing Risk and Uncertainty in Evaluating Hydrocarbon Producing Properties," published by the Society of Petroleum Engineers. Petitioners' principal valuation witness was a member of H.J. Gruy & Associates.

[22]On the acquisition of the leases, Brannan stated that "payment was made at the time of the assignment by Trevor Phillips. Magna did not have that kind of money." He then testified:

Q. And what kind of money are we talking about?

A. Sometimes a few thousand dollars; sometimes $10,000.00 to $12,000.00 was the land cost.

amount of the Western Reserve-to-Magna notes. We find that these lease costs approximate the value of the leases.

We are aware that Magna, Western Reserve, and the drilling company-assignors entered into joint agreements or exploration agreements when the lease assignments were made. In these agreements, Western Reserve obligated itself to advance money needed for drilling wells on the leases. Because the assignors obtained drilling contracts as parts of the deals, petitioners argue that the assignors may have been willing to part with the leases at a lower price than the assignors would have demanded in transactions not coupled with drilling contracts. The record contains no information whatever on how much the accompanying drilling contracts influenced the lease prices if they did so at all. Nonetheless, the direct cost of the lease assignments plus the full amount of Western Reserve's intangible drilling costs[23] during 1982 and 1983 still represent only a small fraction of the lease values now advocated by petitioners.[24]

Even if we disregard the contemporaneous transactions in which Western Reserve acquired the leases, we think petitioners' valuations are grossly excessive. In making their projections of the potential cash-flow from the leases, petitioners used (a) the amounts of the reserves underlying the leases set forth in a report prepared by an IRS petroleum engineer, (b) the future prices of oil and gas shown in an Annual Report to Congress issued by the U.S. Department of Energy, Energy Information Administration, in 1980 (hereinafter the 1980 Department of Energy report), and (c) the projected drilling and production costs used by the IRS petroleum engineer. After applying various dis-

---

[23]The 1982 and 1983 partnership returns for Western Reserve show the following intangible drilling costs:

| | |
|---|---|
| 1982 | $3,920,222 |
| 1983 | 3,316,268 |

[24]One of petitioners' experts was asked for an explanation of why Western Reserve would give the multimillion dollar notes to Magna for leases which cost only nominal amounts. His explanation: "In my experience, the only thing I could say with that is first of all Trevor Phillips, the general partner, was not an expert by any stretch of the imagination in oil and gas" and "Magna had—possessed expertise." His answer ignored the fact that the offering memorandum, prepared months before any leases were acquired, provides the formula for fixing the amounts of the investor-to-Western Reserve notes at four times the amounts of cash invested by the limited partners. However, his answer implies that Magna took advantage of Western Reserve and exacted a price for the leases in excess of their value.

counts, petitioners treat the discounted revenue figure as the value of the leases.

Using this formula, petitioners, as noted above, arrive at the values of $17,267,428 for the 1981 program leases and $57,079,448 for the 1982 program leases. These figures compare with values computed by the IRS petroleum engineer, using prices of $30 to $34 per barrel for oil, of $1,418,000 and $3,552,000 for the 1981 and 1982 program leases, respectively.

We are far from convinced that the IRS petroleum engineer's cost figures are reliable. They do not appear to take into full account the eventual necessity for reworking wells when production lags, for replacing depreciated or obsolete equipment over the years, paying overhead and other expenses, and the like. It must be remembered that all of those costs would have to be paid from the 35 percent of gross receipts to be retained by Western Reserve after the 12- and 24-month (later only the 12-month) notes were paid.

Nor are we convinced that the estimates of reserves of oil and gas underlying the leases have much validity. As we understand the estimates, the engineer resolved every doubt in favor of the maximum possible reserves and assumed every possible well would be drilled. He based his estimates not on a reasoned analysis of available geologic and geophysical data but largely on oral conversations with drilling company representatives without any apparent consideration of their motives, the reliability of their judgments, or their possible perennial optimism. Further, it is not clear whether those conversations distinguished between estimated reserves and estimated *recoverable* and *marketable* reserves.

In other words, we have before us no knowledgeable analysis of the available geologic and geophysical data on the oil and gas recoverable and marketable[25] from the leases. Nonetheless, respondent accepts the engineer's report, and we fully understand why petitioners eagerly embrace the report's cost and reserve figures. In these

---

[25]The marketability factor is highlighted by the statement in Phillips' letter of May 31, 1983, quoted in part in our findings, that "Crude oil prices have declined and the marketplace for natural gas is still unstable. (In fact very little of our gas is being purchased.)"

circumstances, notwithstanding our own reservations, we proceed to examine the income projections on the assumption that the reserve estimates and cost figures have some factual foundation.

Even making that assumption, we think petitioners' estimates of projected income are grossly flawed. Apart from the absence of any objective analysis of recoverable and marketable reserves or any realistic consideration of costs of future production, we do not think the 1980 Department of Energy report can appropriately be used to project the reasonably expected income from Western Reserve's leases. The following table taken from that report shows the oil price "forecasts" for 1980 to 1995 in mid-1979 dollars and in nominal dollars:

*In mid-1979 dollars ($/bbl)*

|  | 1980 | 1985 | 1990 | 1995 |
|---|---|---|---|---|
| Low price | 32.66 | 32 | 32 | 32 |
| Midprice | 32.66 | 37 | 41 | 50 |
| High price | 32.66 | 43 | 49 | 70 |

*In nominal dollars ($/bbl)*

|  | 1980 | 1985 | 1990 | 1995 |
|---|---|---|---|---|
| Low price | 37.24 | 53 | 77 | 106 |
| Midprice | 37.24 | 61 | 98 | 165 |
| High price | 37.24 | 71 | 117 | 231 |

Stated generally, petitioners' experts applied these price "forecasts" to the reserves and costs determined by the IRS petroleum engineer and then made various discounts on a variety of assumptions in reams and reams of computation tables.

The 1980 Department of Energy report was based on mid-1979 and earlier price figures and was prepared during the world energy crisis of the late 1970's. That crisis was produced mainly by the Iranian Revolution and the related oil embargo. In a sense, the report presented a worst-case scenario as of the period when it was in preparation. The difference between the mid-1979 and the nominal dollar figures shown in the above table demonstrates the rapidly escalating inflation rate during the late 1970's which, by 1981 and 1982, was already being dealt with by the Federal Reserve Board and other Government agencies. The report

was neither used by, nor intended to be used by, business-men as a basis for business decisions.[26]

The first of Western Reserve's lease acquisitions occurred in December 1981; thirteen of the 25 lease acquisitions occurred as late as March 1, 1983. By these dates, the price of oil had already fallen from its 1980 price of $37.24 per barrel and it continued to fall.[27] The Department of Energy representative, called by petitioners to explain the report, admitted that by the time the Department's next report, the 1981 report, which was published in March 1982, before most of Western Reserve's lease acquisitions occurred, the assumptions underlying the 1980 report were "somewhat dated." Asked how much difference there was in the price forecasts in the 1980 and 1981 report, the representative replied:

It was probably several dollars a barrel difference. * * * The world was starting to change by then, and these reports, like everybody else's reports, tend to reflect some of those changes that are going on on a year-to-year basis.

The record is abundantly clear, moreover, that Western Reserve's representatives either did not know of, or did not rely on, the 1980 Department of Energy report in planning Western Reserve's lease acquisitions. The report was not considered in making any business judgments for Western Reserve. Several items of promotional material in evidence

---

[26]The final paragraphs of the summary of the report, however, states:

"The forecasts contained here must be interpreted in a proper context. The most important caveat associated with any forecasting effort is—simply stated—uncertainty. Uncertainty is a fundamental reality behind all projections of the future, be they political, economic, or technical.

"Although historical trends can be useful in charting the future, they may not be representative of a new course from year to year. The EIA approach to forecasting—the development of a range of prices, energy demands, and fuel supplies—is structured to plot future uncertainty as well as possible. In this spirit, the policymaker, businessperson, and homeowner who may read and use this volume are reminded of its value and its limitations."

[27]We take judicial notice of the following excerpt from a table published in Basic Petroleum Data Book, Vol. VII, No. 3 (Sept. 1987), covering the prices of crude oil in the States in which Western Reserve had wells and the United States as a whole:

|  | 1981 | 1982 | 1983 | 1984 | 1985 |
|---|---|---|---|---|---|
| Colorado | $35.69 | $31.56 | $28.92 | $28.09 | $25.64 |
| Louisiana | 35.45 | 32.44 | 30.02 | 29.67 | 27.24 |
| Texas | 35.06 | 31.77 | 29.35 | 28.87 | 26.80 |
| United States | 31.77 | 28.52 | 26.19 | 25.88 | 24.08 |

The Data Book identifies the source of these figures as the Department of Energy, Energy Information Administration.

computed projected income from Western Reserve's proposed operations by using a price of $34 per barrel and assuming that oil prices would increase 4 percent annually. The letter to investors transmitting petitioner Ferrell's canceled 24-month and the related long-term notes, dated May 31, 1983, quoted in part in our findings, stated that "Crude oil prices have declined and the marketplace for natural gas is still unstable. (In fact very little of our gas is being purchased.)" That May 31, 1983, letter was written only a few weeks after Western Reserve made 13 of the 25 lease acquisitions on March 1, 1983.

Finally, we have the anomalous situation of petitioners' claiming, as an alternative to their now-conceded advance minimum royalties deductions, abandonment losses for 1982 with respect to five leases, the E. Miller, LeBlanc, DuPont #1, H. Thompson, and Cavasos prospects. All of these prospects were acquired on June 1, 1982, and allegedly abandoned before the end of that year. According to petitioners, these leases constituted more than 62 percent (or approximately $10,950,000) of the alleged $17,267,428 value of the so-called 1981 program, i.e., the leases acquired with cash invested in 1981 by the limited partners. We think this position on the amount of the abandonment losses alone demonstrates that the values advocated by petitioners are in no way related to reality. The value of the leases approximated what Western Reserve paid the assignor-drillers for them.

(e) *The Limited Partners' Notes to Western Reserve*

Petitioners rely to some extent on the purportedly recourse notes the investors were required to sign on entering Western Reserve to show the investments had economic substance.[28] To become a Western Reserve limited partner, an investor was required, as a minimum, to pay Western Reserve $10,000 in cash, execute 12- and 24-month nonrecourse notes for $10,000 each, and execute three long-term recourse notes of $40,000 each payable no later

---

[28]In his opening statement, petitioners' counsel stated:

"It is really the assumption agreements and the promissory note—notes, I should say—from Western Reserve to Magna which create this basis in [sic] 'at risk.' The notes executed by limited partners to Western Reserve are not as significant or relevant with respect to the basis or at risk issue."

than 19, 20, and 21 years (or 20, 21, and 22 years, depending on the year of the investment) after they were signed. The nonrecourse notes were to be paid from production income. The long-term notes, purportedly recourse on their face, could, petitioners argue, have been enforced. As security for the Western Reserve-to-Magna notes, Western Reserve purportedly gave Magna something in the nature of a mortgage on all of the investors-to-Western Reserve notes along with its other assets.

We do not think, however, that there was any intention to enforce the payment of any of the long-term, purportedly recourse notes. The promotional material, quoted in our findings, repeatedly explains that the notes were required to be recourse obligations for tax reasons. Those same materials also repeatedly state that the notes will be paid from production income.

Moreover, as stated in our findings, under date of May 31, 1983, Phillips unilaterally canceled the 24-month notes "along with the long-term notes which accompany them." The only justification for the cancellation was the decline in crude oil prices and difficulties in selling natural gas. Even accepting petitioners' argument that the cancellation related only to one set of the long-term notes, this unilateral recision of at least one-third of the anticipated capital contributions is further evidence that there was no intention to enforce the notes.

Finally, article 10.5 of the partnership agreements, quoted in our findings, authorizes limited partners, after paying $10,000 cash contributions and giving long-term notes, to elect to terminate future obligations due in 1982, 1983, and 1984 and 21 and 22 years after formation of the partnership. All the partner needed to do was to notify the general partner no later than November 1 of the year of the election.

Petitioners argue that this cancellation provision applies only if the limited partner first files for bankruptcy. We do not agree. It is true that the first part of article 10.5 gives each limited partner an option to require the general partner to purchase his interest in the partnership "if the Limited Partner files for bankruptcy." As we read the article as a whole, however, that option and the procedure for the

partners' withdrawal by termination of a partner's future obligations on the note are separate provisions. In our findings, we have quoted Phillips' understanding of the provision, and he was a party to the agreement. In substance, his view, consistent with our own, was that the provision authorized the cancellation of the notes if notice was given before November 1 of the year of the cancellation. A note that can be renounced in this manner obviously has no economic substance.

(f) *Conclusion*

In summary, Western Reserve's machinations were carried out for the purposes of enriching Phillips and Mabile, the promoters, who had no oil and gas business experience, and providing tax deductions for petitioners and the other investor-limited partners. The Western Reserve activities served no other substantial commercial, legal, or profit objectives. We recognize that oil and gas exploration is speculative and large profits can be realized from a bona fide oil and gas venture, that Congress has enacted various tax measures (e.g., intangible drilling costs and percentage depletion provisions) to encourage oil and gas exploration, and that the Western Reserve promotional material included representations on potential profits. The manner in which the Western Reserve transactions were structured and carried out, however, demonstrates that any profit motive was subordinate or incidental. The investors merely bought tax shelters. Because it has not been shown that the promoters' and the general partners' objective was to make a profit, Western Reserve was not engaged in a trade or business, and the claimed deductions turning on section 162(a) and 167(a) are not allowable. *Polakof v. Commissioner,* 820 F.2d 321, 323 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; *Independent Electric Supply, Inc. v. Commissioner,* 781 F.2d 724, 726 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; *DePinto v. United States,* 585 F.2d 405, 408 (9th Cir. 1978).

We have reached the foregoing conclusion that the general partners and promoters of Western Reserve did not have a bona fide profit purpose in the light of objective facts. Basically, those same objective facts show that the

Western Reserve transactions "are devoid of economic substance consonant with their intended tax effects." *Rose v. Commissioner,* 88 T.C. at 415. That the Western Reserve and Magna activities had no practical economic effect other than the creation of tax losses is demonstrated by Western Reserve's gratuitous execution of the multi-million-dollar notes to Magna at the end of each year, purportedly as consideration for leases it had already bought and paid for; the absence of any relationship between the amounts of those notes, fixed in advance, and the value of the leases; the practical fact that the Western Reserve-to-Magna notes, the key to the tax benefits, would never be paid; the arrangements for siphoning off to Phillips and Mabile, directly or indirectly, all except 35 percent, up to $118 million, of the gross receipts (not just net income) from oil and gas production which, the experience for 1982 and 1983 shows, would not have permitted the long-term economic survival of Western Reserve; and the on-again-off-again treatment of the investors' assumptions of the multi-million-dollar notes as well as the investors' notes to Western Reserve. A transaction entered into for tax benefits without any objective prospect of producing a profit apart from those benefits will not be given effect for tax purposes. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978); *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91-92 (4th Cir. 1985), affg. in part, revg. in part, and remanding 81 T.C. 184 (1983); *Patin v. Commissioner,* 88 T.C. 1086, 1116 (1987), on appeal (4th, 5th, 6th, and 9th Cirs., Jan. 25, 1988); *Beck v. Commissioner,* 85 T.C. 557, 569 (1985). Petitioners are not entitled to the claimed deductions.

### 2. *The Interest Deduction Claimed by Western Reserve Is Not Allowable*

Western Reserve deducted under section 163(a),[29] for 1982, $1,852,560 as an accrued interest expense. The deduction was based on the 1981 Western Reserve-to-

---

[29]SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

Magna note of $20,584,000. That note calls for simple, noncumulative interest of 9 percent per annum.

An interest deduction is allowable only with respect to genuine indebtedness. *Estate of Franklin v. Commissioner,* 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Odend'hal v. Commissioner,* 80 T.C. 588, 604-605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984). In our foregoing discussion, we have found that the Western Reserve-to-Magna notes were not genuine indebtedness but were a façade to provide support for tax deductions. The interest deduction is not, therefore, allowable.

### 3. *The Claimed Abandonment Losses Are Not Allowable*

Petitioners argue that the five leases listed in our findings, with respect to which abandonment losses are claimed, became worthless in 1982. Petitioners compute the total value of the "1981 program" to be $17,267,428. The five leases claimed to have been abandoned, according to petitioners, constituted approximately 63 percent of the value of the 1981 program. On that ground petitioners claim an abandonment loss of over $10,952,730.

This deduction is not allowable for several reasons. All five leases on which petitioners base their claim were acquired on June 1, 1982. The agreements between Magna and Western Reserve authorized Western Reserve to drill at any time within 1 year. True, a dry hole was struck on each of these leases in 1982, but that did not prevent further drilling until June 1, 1983, five months after the close of the year. To be entitled to an abandonment loss, a taxpayer must show "an intention to abandon the property, coupled with an act of abandonment." *Massey-Ferguson, Inc. v. Commissioner,* 59 T.C. 220, 225 (1972); see also *Brountas v. Commissioner,* 692 F.2d 152, 162 (1st Cir. 1982), and *CRS Corp. v. Commissioner,* 693 F.2d 281, 283-284 (3d Cir. 1982), both revg. on other grounds *Brountas v. Commissioner,* 73 T.C. 491 (1979). There is no showing that Western Reserve released any of its rights in 1982, that any leases expired in 1982, or that any judgment was made that the leases on which the dry holes were drilled were worthless and would be abandoned. Therefore, petitioner has failed to show that

the leases were abandoned during the tax year for which the loss is claimed.

Further, in the foregoing discussion, the Court has held that the Western Reserve-to-Magna notes were not genuine indebtedness but were executed for tax purposes. The arrangement in which the leases were acquired lacked economic substance. The transactions do not, therefore, establish that Western Reserve had any basis in the properties which would support the claimed abandonment losses.

### 4. *Petitioners' Underpayments of Tax Were Attributable to Negligence or Intentional Disregard of the Revenue Laws Within the Meaning of Section 6653(a)(1) and (2)*

Section 6653(a)(1) provides for the imposition of a 5-percent addition to tax if any part of any underpayment of tax is due to negligence or intentional disregard of the revenue laws. Section 6653(a)(2) provides for a further addition to tax in the form of additional interest with respect to the portion of any such underpayment attributable to negligence or disregard of the laws. Negligence under the section is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Neely v. Commissioner,* 85 T.C. 934, 937 (1985).

Any tax scheme promising tax savings equal to 12 times the amount invested, as did this one, would raise doubts in the mind of any prudent investor intending to comply with the tax laws. Cf. *Hanson v. Commissioner,* 696 F.2d 1232, 1234 (9th Cir. 1983), affg. per curiam a Memorandum Opinion of this Court. Yet there is no evidence that petitioners sought the unbiased advice of competent tax lawyers or accountants before making their Western Reserve investments and claiming the deductions.

Petitioner Ferrell admitted that he invested in Western Reserve at least in part for its income tax advantages at the suggestion of his tax return preparer, Henry Vierregger. Although Vierregger denied he received a commission for placing Western Reserve investments, he admitted that he suggested it as an investment for a number of his clients. In his testimony, he denied that he had advised Ferrell to

make the investment. He attempted to leave the impression that he had analyzed the Western Reserve prospectus. His testimony showed that he was, in general, familiar with the broad outlines of the Western Reserve scheme. However, his tax research apparently consisted of a telephone call to Mabile who assured him "he had taken pains to make sure that Western Reserve complied with all interpretations of the law at that time." Vierregger knew little, if anything, about the economics of the precise arrangements for the Western Reserve operations.

Petitioner Crowder did not testify at the trial. Mr. Crowder's business manager, Clark Lilly, sold Mr. Crowder the Western Reserve units. Lily testified that he learned of Western Reserve from Mabile who described himself as a "tax shelter specialist." He testified that Mabile "marched me through the Code and showed me why it was good, legitimate." Lily admitted that he did nothing to verify the accuracy of Mabile's representations. Lily placed Western Reserve investments with other clients of his as well as Mr. Crowder and received compensation from "Terry Mabile & Associates" for the investments he placed.

Petitioners Woltman made their Western Reserve investment through Garry Gorman who placed similar investments with other clients. In 1981, Gorman sold Western Reserve investments to approximately 50 clients (earning $50,000 to $75,000 in commissions) and from 75 to 100 clients in 1982 (earning commissions of approximately $200,000). He also sold 100 to 125 interests in the 1983 Western Reserve Oil & Gas Co., Ltd., another Phillips-sponsored tax shelter, earning "in the neighborhood of a couple hundred thousand, approximately." There is no evidence that the Woltmans consulted any reputable advisor on the tax consequences or economics of their investments or took any other reasonable steps to determine whether the Western Reserve deductions were allowable.

Petitioners have not carried their burden of showing that, within the meaning of section 6653(a)(1) and (2), they were not negligent or did not intentionally disregard the revenue laws in claiming the deductions in dispute.

## 5. *Petitioners' Understatements of Tax Were Not Attributable to a Valuation Overstatement Within the Meaning of Section 6659*

Respondent determined that petitioners' underpayment of tax was attributable to a "valuation overstatement" within the meaning of section 6659.[30] That section provides for an addition to tax up to 30 percent of the tax underpayment where there is an underpayment of income tax that is attributable to a valuation overstatement with respect to property or the adjusted basis of property on any return. Under section 6659(c), a valuation overstatement occurs where the claimed value of property or its adjusted basis is 150 percent or more of the value or adjusted basis that is "determined to be correct." The section applies with respect to returns filed after December 31, 1981. *Nielsen v. Commissioner*, 87 T.C. 779 (1986). The section, therefore, covers both 1981 and 1982, the years before the Court.

To support the addition to tax, respondent relies upon the advance minimum royalty deductions, now conceded by petitioners, claimed on the 1981 and 1982 partnership returns in the amounts of $20,484,000 and $59,344,000, respectively. Respondent argues that minimum royalty expenditures are capital in nature and that absent Western Reserve's election pursuant to section 1.612-3(b)(3), Income Tax Regs., the partnership would have been required to capitalize the minimum royalty notes. The cost of acquiring the leases shown in this capital account, according to

---

[30]SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATE-
        MENTS FOR PURPOSES OF THE INCOME TAX.
  (a) ADDITION TO THE TAX.—If—
    (1) an individual, or
    (2) a closely held corporation or a personal service corporation,
has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable.

        *     *     *     *     *     *     *

  (c) VALUATION OVERSTATEMENT DEFINED.—
    (1) IN GENERAL.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).
    (2) PROPERTY MUST HAVE BEEN ACQUIRED WITHIN LAST 5 YEARS.—This section shall not apply to any property which, as of the close of the taxable year for which there is a valuation overstatement, has been held by the taxpayer for more than 5 years.

respondent, would have been its stated basis for the lease. Because the face amount of the royalty notes exceeded the value of the property by more than 150 percent, respondent argues the section 6659 addition to tax must be imposed.

We think respondent's argument misconceives the nature of an advance minimum royalty interest. "A royalty interest, for Federal tax purposes, is a right to oil and gas or minerals in place that entitles its owner to a specified fraction, in kind or in value, of the total production from the property, free of expense of development and operation." C. Russell & R. Bowhay, Income Taxation of Natural Resources, sec. 2.03 (1988); *Getty Oil Co. v. United States,* 185 Ct. Cl. 244, 249-250, 399 F.2d 222, 225 (1968). "An advance or minimum royalty represents a production royalty paid in advance. It usually takes the form of advance minimum royalties to encourage the lessee to begin production as quickly as possible." See C. Russell & R. Bowhay, *supra,* sec. 18.22. An advance minimum royalty is recoupable out of future royalties. Sec. 1.612-3(a) and (b), Income Tax Regs.

As we have discussed above, the amounts of the Western Reserve-to-Magna notes, which purported to be payments of advance minimum royalties, were four times the amounts of the cash paid to Western Reserve by the limited partners. The amounts of the notes thus were not dependent on the value of the leases. Western Reserve's minimum royalty deductions were subject to disallowance on a variety of grounds including the absence of a trade or business, the lack of economic substance in the whole transaction, and the failure of Magna to retain an economic interest in the minerals in place. None of these grounds, however, turned on the value or overvaluation of the leases. We think the value or basis of the leases is too tangentially related to the now conceded advance minimum royalty deductions to support the imposition of the section 6659 additions to tax.

### 6. *Petitioners' Understatements of Tax Were Substantial Within the Meaning of Section 6661*

Section 6661(a)[31] imposes an addition to tax equal to 25 percent of any underpayment attributable to a substantial

---

[31]SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY.

(a) ADDITION TO TAX.—If there is a substantial understatement of income tax for any taxable

understatement. For purposes of the section, there is a substantial understatement of tax if the amount of the understatement of tax exceeds the greater of 10 percent of the tax shown on the return or $5,000. Sec. 6661(b)(1). The amount of the understatement, in the case of a tax shelter, may be reduced by an amount for which there was substantial authority for the treatment adopted by petitioners on their return. This reduction is not available in the case of a tax shelter unless the taxpayer reasonably believed that the claimed tax treatment was "more likely than not" the proper treatment. Sec. 6661(b)(2)(C)(i)(II).

The amounts of the understatements in each case before the Court exceeded 10 percent of the tax shown on the returns. From the testimony of petitioners and their tax return preparers or advisors, it is clear that they did not make the kind of legal or factual analysis of the Western Reserve arrangement that would enable them to formulate any reasonable belief one way or another as to whether the tax treatment they gave to their claimed Western Reserve

year, there shall be added to the tax an amount equal to 10 percent of the amount of any underpayment attributable to such understatement.

  (b) DEFINITION AND SPECIAL RULE.—

    (1) SUBSTANTIAL UNDERSTATEMENT.—

      (A) IN GENERAL.—For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—

        (i) 10 percent of the tax required to be shown on the return for the taxable year, or

        (ii) $5,000.

      (B) SPECIAL RULE FOR CORPORATIONS.—In the case of a corporation other than an S corporation or a personal holding company (as defined in section 542), paragraph (1) shall be applied by substituting "$10,000" for "$5,000".

    (2) UNDERSTATEMENT.—

          *       *       *       *       *       *       *

      (B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM.—The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—

        (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

        (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

      (C) SPECIAL RULES IN CASES INVOLVING TAX SHELTERS.—

        (i) In general.--In the case of any item attributable to a tax shelter—

          (I) subparagraph (B)(ii) shall not apply, and

          (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.

deductions was more likely than not the proper treatment. We hold that the addition to tax is applicable.[32]

### 7. *Petitioners Are Liable for the Additional Interest Imposed by Section 6621(c) (Formerly Section 6621(d))*

Section 6621(c) (formerly section 6621(d)) provides for an elevated interest rate where there is a substantial underpayment (at least $1,000) in any taxable year attributable to one or more tax-motivated transactions. The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the date of the enactment of the section. *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The term "tax motivated transaction" includes any "sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v).

For the reasons stated at some length above, the whole Western Reserve scheme lacked economic substance. There was no reasonable prospect that it would produce profits apart from the tax benefits. The underpayments in these cases were thus attributable to a "sham or fraudulent transaction." *Patin v. Commissioner, supra* at 1128. The key element of the transaction was the multi-million-dollar Western Reserve-to-Magna notes the amounts of which were deducted by Western Reserve as advance minimum royalties. The amounts were not related to any anticipated production from the leases but to the cash payments made by the investors. Western Reserve gave the notes to Magna at the end of each year even though Western Reserve itself had already paid the assignor-drilling companies the full cost of the leases; Magna incurred no costs in connection with the leases except Brannan's salary and expenses, all of

---

[32]The lengthy legal opinion included in the offering memorandum discussed a variety of tax issues. The most significant deduction was the advance minimum royalty deductions which, after the shelter sales forces had reported, turned out to be $20,484,000 for 1981 and $59,344,000 for 1982. Yet there is no discussion in that memorandum, for example, of whether a note or cash payment is an advance minimum royalty if the payee has no economic interest in the oil and gas in place. See, e.g., *Brountas v. Commissioner,* 73 T.C. 491, 580 (1979), revd. on other issues and remanded 692 F.2d 152 (1st Cir. 1982), revd. sub nom. *CRS Corp. v. Commissioner,* 693 F.2d 281 (3d Cir. 1982). Moreover, it did not deal with the artificiality of setting the advance minimum royalty payments at four times the amount of the cash investments made by the limited partners. Nor did it deal at all with the question of how Western Reserve could survive as an entity, with the right to retain only 35 percent of its gross receipts for the payment of all operating and other expenses.

which were paid with funds transferred by Western Reserve to Magna. The whole Western Reserve scheme, we reiterate, served only to enrich Phillips and Mabile and his associates and to create a façade for the 12-for-1 (or 8-for-1) deductions to be claimed by the limited partners. We hold that the addition to tax is applicable.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

