MORTON D. FIELDING AND JANE A. FIELDING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fielding v. Commissioner
Docket No. 11518-89
United States Tax Court
T.C. Memo 1992-553; 1992 Tax Ct. Memo LEXIS 574; 64 T.C.M. (CCH) 796; September 17, 1992, Filed *574 Decision will be entered under Rule 155. For Petitioners: Winthrop Drake Thies. For Respondent: William S. Garofalo and Patrick E. Whelan. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined Federal income tax deficiencies of $ 11,234 and $ 1,087 for petitioners' 1980 and 1982 taxable years, respectively. The deficiencies are attributable to respondent's disallowance of tax benefits claimed in connection with Abbott Drilling Associates, a limited partnership. Respondent also determined a $ 561.70 addition to tax under section 6653(a)[1] for 1980 and $ 54.35 plus 50 percent of the interest due on $ 1,087 under section 6653(a)(1) and (2) for 1982. In addition, respondent determined that petitioners are liable for increased interest under section 6621(c) on the entire deficiency decided for the 1980 and 1982 taxable years. At the beginning of trial, petitioners conceded the correctness of respondent's determinations for the 1982 taxable year. *575 After concessions, the issues presented for our consideration are: (1) Whether Abbott Drilling Associates was organized and operated with the objective of making a profit; (2) whether Abbott Drilling Associates incurred deductible intangible drilling costs in the amounts claimed; (3) whether certain miscellaneous expenses claimed in connection with Abbott Drilling Associates were ordinary and necessary expenses incurred in a trade or business; (4) whether petitioners were at risk within the meaning of section 465 for a $ 20,000 note; (5) whether petitioners are liable for an addition to tax for negligence for taxable year 1980; and (6) whether petitioners are liable for increased interest under section 6621(c) for taxable year 1980. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. Petitioners filed a joint Federal income tax return for 1980. At the time their petition in this case was filed, petitioners resided in New York, New York. Petitioner Morton Fielding (petitioner) was employed as a podiatrist, and petitioner Jane Fielding was employed as a nurse during the period under consideration. *576 During 1980, petitioner received income of $ 142,281 from his podiatry practice. Petitioners claimed a $ 27,484 loss on their 1980 tax return attributable to Abbott Drilling Associates Limited Partnership (Abbott). Abbott, a Kentucky limited partnership, was formed on December 10, 1980, to develop a water-flood oil recovery project in the Ashley Pool of the Big Sinking Field, Powell County, Kentucky. Abbott utilized the accrual method of accounting. Pursuant to the confidential private placement memorandum, up to 35 partnership interest units, at $ 30,000 per unit, were available for purchase. The units were to be paid for in cash upon execution of the subscription agreement. Alternatively, at the investor's option, the units were payable one-third cash down with the balance payable of one-sixth on December 15, 1981, and the remaining half on December 15, 1982. Twenty-six limited partnership interests were purchased. All investors elected the optional partial payment method. The 26 limited partners contributed $ 254,173 in cash and executed subscription notes due on December 15, 1981, totaling $ 145,232 and December 15, 1982, totaling $ 365,595. In 1980, petitioner had *577 a transitory ischemia, known commonly as a ministroke, in the brain. At that time, petitioner became concerned that his deteriorating health would result in an early retirement. Therefore, he began looking for additional income-producing investments. Petitioner purchased an interest in Abbott after an associate, Dr. Myles Schneider, brought it to his attention. Petitioner was one of 26 limited partners. Petitioner contributed $ 10,000 in cash to the capital of Abbott and executed a $ 20,000 subscription note. It was petitioner's belief that he would not be required to pay the subscription note if Abbott derived sufficient income from production. Petitioner did not anticipate that he would be required to pay the subscription note. The promotional materials contained the explanation that the partnership was to be engaged in drilling for oil and gas. A geologist was listed under the heading "Advisory Personnel" in the materials. Attached to the promotional materials provided to investors was the geologist's report dated July 16, 1980. That report was incomplete and reflected that the expert was not sure of: (1) The location of the property; (2) the number of wells that had *578 been drilled; and (3) the amount of prior oil production. Abbott was formed by Stanley Wyman (Wyman) and Lewis Fromkin (Fromkin). Wyman was a member of several oil and gas professional associations. Wyman became involved with his first oil venture during 1976. From 1976 through 1980, Wyman was involved with approximately 70 oil well drilling partnerships. The oil drilling ventures were not extremely risky because the partnerships drilled shallow wells in proven oil fields. At that time the success rate was at least 90 percent. Approximately 700 oil or gas wells were drilled. Wyman and Fromkin recruited Jerry Cohn (Cohn) to serve as the general partner of Abbott. Cohn was Wyman's brother-in-law. Cohn received $ 30,000 from Abbott as a management fee. Cohn had no experience in the oil and gas field prior to becoming Abbott's general partner. Prior to becoming general partner of Abbott, Cohn had been involved in various wholesale and retail operations, including the importing and distribution of sunglasses and jewelry. On December 29, 1980, Abbott acquired oil and gas leases (Abbott lease or Abbott lease property) from Oil Resources Management Corp. (Oil Resources) covering *579 approximately 140 acres of land situated in South Fork, Red River, Powell County, Kentucky. Oil Resources was compensated for its services by an overriding royalty interest in future production. Oil Resources was formed by Wyman and John Pfauth (Pfauth) in December 1976 to be the leasing agent responsible for locating and acquiring rights to oil and gas leases. Oil Resources fractionalized the leasehold interests into component portions for partnerships before the wells were drilled. Oil Resources acquired its interest in the Abbott lease property from Compass Development, Inc. (Compass). Abbott, as well as other partnerships, was formed by Wyman and Fromkin to be associated with Compass. Compass obtained oil leases in Pennsylvania and Kentucky and drilled or hired subcontractors to drill the leases. Compass was the primary driller/operator of wells and also the source of various leasehold interests for the oil and gas drilling ventures. Compass was owned by two Abbott limited partners, Pfauth and Robert Matthies (Matthies). Pfauth was also the president and general manager of Compass. Matthies was the treasurer of Compass and a member of the board of directors. On December *580 29, 1980, Abbott entered into a turnkey-drilling agreement with Compass. Compass agreed to drill 12 producing wells and 18 water-injection wells [2] for $ 40,175 per well, with $ 32,750 allocated to intangibles and $ 7,425 to capital costs. According to the turnkey agreement between Abbott and Compass, all wells were to be drilled and completed no later than December 31, 1981. Abbott, however, was financially unable to drill the planned wells within 1 year. The financing was based on the premise that the production from the initial few wells would eventually pay for all of the other wells. The treasurer of Compass admitted that it would have taken more than 1 year to generate enough money to pay for all the wells to be drilled. Capital costs (tangibles) were payable by nonrecourse promissory notes from Abbott. Noncapital costs (intangibles) were payable by promissory notes from Abbott equal to the notes delivered by the limited partners and the balance in cash. Twenty-five percent of the noncapital promissory notes were due on December 15, 1981, and the remainder was due on December 15, 1982. None of the Abbott notes or the individual limited partners' notes were paid. *581 Compass subcontracted the actual drilling for Abbott to Faulkner Drilling Co. Faulkner Drilling Co., which was under contract with Compass, drilled and completed one well for Abbott on the Abbott lease. This well was subsequently abandoned. Four previously abandoned wells on the Abbott lease were also reopened. The reopened wells had been drilled sometime prior to 1966 and had been pumped to depletion before abandonment. No other wells were ever drilled. Faulkner Drilling Co. was not paid for work completed on the Abbott lease. Compass filed a petition for bankruptcy on December 29, 1981. Consolidated Energy Corp. was formed on December 23, 1983, to be the successor to Compass under the reorganization plan proposed by Fromkin and Wyman. The reorganization plan was confirmed by the bankruptcy court on March 14, 1984, and Consolidated Energy Corp. was named successor to Compass. On its 1980 partnership return, Abbott claimed a loss of $ 707,924, consisting of $ 687,750 intangible drilling costs, $ 12,000 management fee, $ 8,000 legal fee, and $ 174 amortization. For the 1981 and 1982 taxable years, Abbott claimed losses of $ 3,923 and $ 6,059, respectively. On petitioners' *582 1980 tax return, they claimed a $ 27,484 loss deduction attributable to their distributive share of Abbott's loss. OPINION I. Profit Objective
It is petitioners' contention that Abbott was organized and operated with the objective of making a profit. Petitioners bear the burden of proving that respondent's determination is in error. Rule 142(a). Section 183(a) provides that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided in section 183(b). An activity not engaged in for profit is defined in section 183(c) as an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraphs (1) or (2) of section 212. Section 183(b) separates deductions claimed with respect to an activity not engaged in for profit into two categories, i.e., those which are not dependent upon a profit objective and those that are so dependent. Under section 183(b)(1) the deductions which are not dependent upon a profit objective, such as interest, are allowable according to their governing sections; however, under section 183(b)(2), the deductions which *583 are dependent upon a profit objective are deductible only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1). The determination of whether a profit objective existed is a factual inquiry made at the partnership level. Ferrell v. Commissioner, 90 T.C. 1154 (1988); Brannen v. Commissioner, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The intent of a partner is not determinative of the partnership's profit objective. Brannen v. Commissioner, supra at 505 n.14. While a reasonable expectation of profit is not required, Abbott must have had an actual and honest objective of making a profit. Beck v. Commissioner, 85 T.C. 557, 569 (1969); sec. 1.183-2(a), Income Tax Regs. Whether Abbott had the objective of engaging in a drilling venture to make a profit is a factual question to be resolved by all of the surrounding circumstances. Beck v. Commissioner, supra at 570; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), *584 affd. 615 F.2d 578 (2d Cir. 1980). The burden of proving the objective to make a profit is on petitioner. Rule 142(a); Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine criteria to be considered in determining whether an activity is one engaged in for profit. The factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor, nor the existence of even a majority of the factors, is controlling. Golanty v. Commissioner, supra at 426; *585 Dunn v. Commissioner, supra at 720. Petitioners argue that the record supports the conclusion that an objective to make a profit in the oil and gas drilling activity existed at the partnership level. Conversely, respondent argues that Abbott was not organized and operated with the objective of making a profit within the meaning of section 183. Our analysis of the relevant factors in this case results in our conclusion that the partnership did not operate the oil and gas drilling activity with a profit objective. We first consider the manner in which the partnership carried on the oil and gas drilling activity. Sec. 1.183-2(b)(1), Income Tax Regs.Abbott entered into a turnkey-drilling agreement whereunder Compass agreed to drill 30 wells within 1 year. Through the time of trial, only one well had been drilled and Compass had been in bankruptcy. Even if no bankruptcy had occurred, because of the financial structure of the transaction Abbott could not have drilled or caused the drilling of 30 wells, or even a meaningful portion of them, within 1 year. The continued financing of operations was based on the premise that the production from the *586 initial few wells would eventually pay for all of the other wells. Accordingly, unless the first few wells were certain to be successful, it was most unlikely that there would be financing for future wells. In essence, investors were only required to make an up-front out-of-pocket payment in exchange for a 4-to-1 writeoff. The 4-to-1 writeoff, however, was based upon events (i.e., the drilling of 30 wells) which were improbable. In this connection, we also note that the turnkey contract, dated December 29, 1980, called for Compass (the driller) to "complete a portion of its work * * * on or before December 31, 1980 and fully complete all of its work no later than December 31, 1981". In addition, the leasing and drilling agreements were between entities which were operated and/or controlled by a common group of people. These aspects of the agreement, when considered together, lead us to the conclusion that this transaction was structured merely to generate tax benefits and was without substance. This is but another instance of a transaction structured solely in an attempt to capture tax benefits. Another factor we consider is the expertise of the taxpayers and/or their advisers. *587 Section 1.183-2(b)(2), Income Tax Regs., provides that preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit objective. Wyman testified that he and the partnership obtained advice from reputable persons including geologists, drillers, attorneys, and certified public accountants. In spite of that testimony, only one report was offered into evidence, a geologist's report completed by Phil Miles, pertaining to the feasibility of the venture. Wyman testified that he relied on the Miles report in determining whether Oil Resources should buy the Abbott lease. It should be noted that the report reveals that its author was not aware of the exact location of the Abbott lease. We were convinced by respondent's expert that the Miles report was superficial. The continued operation of an unprofitable activity past a reasonable startup phase may be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, a history of losses is not necessarily determinative of a lack of an actual and honest *588 profit objective. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Allen v. Commissioner, 72 T.C. 28, 34-35 (1979). A series of losses beyond the startup stage may not be inconsistent with an actual and honest profit objective if such losses can be explained as the result of unforeseen circumstances beyond the taxpayer's control. Sec. 1.183-2(b)(6), Income Tax Regs.
For the taxable year 1980, the partnership reported a $ 707,924 loss on its partnership return. Abbott did not report any income on its 1980 return. Moreover, from 1981 through 1986 Abbott continued reporting losses on its returns and did not report any income from the oil and gas drilling activity. Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit, particularly if the losses from the activity generate substantial tax benefits. Sec. 1.183- 2(b)(8), Income Tax Regs. Petitioner's income from his podiatry practice for 1980 was $ 142,281. Petitioners deducted a loss on their return from the oil and gas drilling activity in the amount of $ 27,484. Petitioner contributed $ 10,000 to the *589 capital of Abbott and at his effective tax rate recovered (in the form of tax benefits) more than his full investment during the first taxable year. Finally, there was no showing of success in carrying on similar activities. Wyman, one of Abbott's promoters, had some success during the period 1976 through 1980 with approximately 70 oil well drilling partnerships. However, the drilling of those wells involved little risk because they were shallow, "proven" wells. The success rate of the proven wells was at least 90 percent. The property in this case was not "proven" and appeared to have been depleted in prior oil production operations. Based upon these considerations we hold that Abbott was not organized and/or operated with the requisite objective of making a profit. II. Intangible Drilling Costs
On Abbott's 1980 return, $ 687,750 of intangible drilling costs were claimed. Section 263(c) authorizes a taxpayer to deduct intangible drilling and development costs in accordance with regulations. Section 1.612-4, Income Tax Regs., provides than an operator has the option to capitalize or to deduct currently intangible drilling expenses incurred in the development of gas *590 and oil properties. Intangible drilling costs include expenses incurred by an operator under a turnkey contract. Respondent conceded the intangible drilling costs for one well which was drilled, but disallowed all deductions in respect to the five wells which were not drilled. [3]
Section 1.612-4(d), Income Tax Regs., provides, in part, that: The option granted * * * to charge intangible drilling and development costs to expense may be exercised by claiming intangible drilling costs as a deduction on the taxpayer's return for the first taxable year in which the taxpayer pays or incurs such costs * * * In Stradlings Building Materials, Inc. v. Commissioner, 76 T.C. 84, 88-89 (1981), we stated that the following criteria are to be considered in order for a taxpayer to qualify for the option under section 1.612-4(a), Income Tax Regs.:
(1) The taxpayer must hold an operating or working interest *591 in the property being developed; [4] (2) the costs in question must relate to the development of the property in which the taxpayer has a working or operating interest; (3) the nature of the expenditure must fall within the definitional guidelines provided by section 1.612-4(a), Income Tax Regs.; and (4) the payment or incurrence of the costs must occur sufficiently early in the development stages so that the taxpayer is exposed to the unknown risks of development. * * * Petitioners rely heavily on Stradlings, where the Court allowed a deduction for prepaid intangible drilling costs in the situation where the contractor failed to perform services in a subsequent tax year. The parties differ in their interpretation of Stradlings. Under that case, petitioner *592 contends that an accrual method taxpayer who has contracted and paid for oil wells under a turnkey-drilling contract may deduct the intangible drilling costs even though the driller defaulted and failed to complete the wells in a subsequent year. Respondent contends that Stradlings is distinguishable and inapplicable. Respondent argues that the intangible drilling costs deduction is not allowable because the all events test has not been satisfied and because an accrual in this case would result in a material distortion of income. Section 263(c) permits the deduction of intangible drilling costs which are in accord with the regulations. Section 1.612-4 (a), Income Tax Regs., [5] requires that to be entitled to a deduction, the taxpayer must be an operator with a working interest. See Stradlings Building Materials, Inc. v. Commissioner, supra at 86; Cottingham v. Commissioner, 63 T.C. 695, 706 (1975); Owen v. Commissioner, T.C. Memo. 1990-172. Petitioners have the burden of showing their entitlement to the deduction. Rule 142 (a); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); *593 Welch v. Helvering, 290 U.S. 111 (1933). In order to show entitlement to the deduction in this case, petitioners must prove they were operators, i.e., that they had a working or operating interest. We find that petitioners have not shown Abbott to be the holder of an operating or working interest in the property or that the costs in question related to the development of the property in which they had a working or operating interest. This entire transaction was structured solely for generating tax benefits and is otherwise without substance. The financing was, at very best, unlikely to materialize within the time constraints of the agreement. The drilling and leasing *594 companies involved the same and/or related people. The terms of the agreements were contrived to provide 4-to-1 leveraging solely for generating tax deductions. The transaction was effected 2 days before yearend and to give the transaction an air of legitimacy called for a certain level of performance prior to yearend. In addition, Wyman's brother-in-law received a $ 30,000 management fee even though he had no experience in oil and gas ventures. The geologist's report, which was supplied with the investment materials, was incomplete and reflected that the expert was not sure of: (1) The location of the property; (2) the number of wells that had been drilled; and (3) the amount of prior oil production. Respondent's expert's analysis of the original geologist's report and of the actual circumstances reflected that the success of the transaction was improbable and, in many respects, unconventional. Respondent's expert opined that there was insufficient information in the geologist's report to meaningfully project the potential for success of the Abbott venture. Respondent's expert also testified that the wells in question had been substantially abandoned before 1980 and secondary *595 recovery methods had already been used on some of the wells. Additionally, respondent's expert testified that tertiary [6] recovery work had not been utilized as a method of oil recovery in the subject area. Although the documentation provided to petitioners and included in this record states that there was a grant of an operating interest, the record is replete with indications that the realities of this transaction are without substance. Petitioners have not carried their burden of showing entitlement to the deductions in question. Due to the lack of profit objective and lack of substance of this transaction, we find it unnecessary to consider other legal *596 arguments of the parties concerning the accounting period, the accounting method, and the all events test. It is also unnecessary to give further consideration to the Stradlings case because this case is factually distinguishable. Accordingly, with the exception of the amounts agreed to by respondent, we hold that petitioners were not entitled to deduct the intangible drilling costs in controversy. Due to this holding it is unnecessary to decide the at risk or ordinary and necessary issues. III. Additions to Tax for Negligence
Respondent determined that petitioners are liable for additions to tax under section 6653(a) for 1980. Petitioners have the burden of proving that respondent's determination of the additions to tax was in error. Rule 142(a). Section 6653(a) provides for an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. For purposes of this statute negligence is the "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). *597 Petitioner argues that he is not liable for the addition to tax for negligence due to his reliance upon the expertise of others. Reasonable and good-faith reliance by a taxpayer on an accountant or attorney may be sufficient to avoid the addition to tax for negligence. United States v. Boyle, 469 U.S. 241, 251 (1985). "However, to escape the penalty on this ground taxpayers must be able to show that the accountant reached his decisions independently after being fully apprised of the circumstances of the transactions." Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. per curiam T.C. Memo. 1968-98. Petitioner testified that he provided his accountant with the placement memorandum and relied upon his accountant's advice. However, a reasonably prudent investor would have analyzed the underlying premises for the investment. For example, a prudent investor would have analyzed the geologist's report or consulted with a qualified person to have it analyzed. That report, when analyzed, was found to be incomplete. Therefore, the information provided to the accountant failed to *598 fully disclose the circumstances of the transaction and/or was based upon an unverified premise. In this regard, there is no evidence that petitioner's accountant or Dr. Myles Schneider, an associate whose advice petitioner also claims to have relied upon, had any expertise in oil and gas or the extent, if any, of the accountant's or Dr. Schneider's review or investigation. Petitioner's accountant did inform him that "this looks like a bona fide operation and it looks like a good investment for you to go into." In order for reliance to be reasonable, it must extend beyond the subject matter of the advice; the taxpayer seeking to utilize the defense must also show that reliance upon the purported expert's ability is reasonable. Bilyeu v. Commissioner, T.C. Memo. 1988-209. Under the circumstances, petitioners have not shown that their reliance was reasonable. We sustain respondent's determination that petitioners are liable for the addition to tax under section 6653(a). IV. Increased Interest under Section 6621(c)
Section 6621(c) provides for a rate of 120 percent of the underpayment rate established under section 6621. To be subject to *599 the rate, the underpayment for a taxable year attributable to one or more tax-motivated transactions must exceed $ 1,000. Sec. 6621(c)(2). Petitioners bear the burden of proving that respondent improperly applied the rate of interest determined under section 6621(c). Under section 6621(c)(3)(B), the Secretary has the authority to specify transactions that will be treated as tax motivated. Deductions and credits disallowed for lack of profit objective under section 183 are considered to be attributable to tax-motivated transactions. Sec. 301.6621-2T Q-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). We have already concluded that the oil and gas drilling venture lacked a profit objective. We, therefore, sustain respondent's determination that petitioners are subject to the interest rate established by section 6621(c). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. A producing well is one which produces oil or gas in commercial quantities, or a well capable of such production but not actually producing because of market conditions. An injection well is designed to bring natural gas, air, water, chemicals, enzymes, steam, carbon dioxide, or any other materials or additives into the producing formation to enhance production of the producing well.↩
3. We do not consider or comment upon the deductibility of the amount allowed by respondent.↩
4. An operator is defined in sec. 1.612-4, Income Tax Regs.↩, as one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or under any other form of contract granting working or operating rights.
5. Under sec. 1.612-4 (a), Income Tax Regs.↩, operators have the option to expense intangible drilling costs if they have the requisite working or operating interest. The regulation also makes expensing available if the formal grant of operating rights is made after the intangible drilling costs are paid or incurred.
6. Respondent's expert explained that there are three levels of oil recovery: primary recovery, where oil flows unassisted (because of natural pressure) from the ground; secondary recovery, which is stimulated by "water drive" (hydraulic pressure) induced below the oil reservoir; and tertiary recovery, which is accomplished by means of an "expanding gas cap".↩